851 So.2d 558 (1999)
Andy Dwight PIERCE
v.
STATE.
CR-96-1668.
Court of Criminal Appeals of Alabama.
March 2, 1999.
Rehearing Applications Denied April 30, 1999.
*562 Ellen Louise Wiesner, Montgomery, for appellant.
William H. Pryor, Jr., atty. gen.; and Jeremy W. Armstrong and Beth Jackson Hughes, asst. attys. gen., for appellee.
BASCHAB, Judge.
This case was originally assigned to another Judge on the Alabama Court of Criminal Appeals. It was reassigned to me on November 9, 1998.
On January 26, 1989, the appellant, Andy Dwight Pierce, was convicted of capital murder for killing Annie Ruth Brooks during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a 10-2 vote, recommended the death penalty. The trial court accepted the jury's recommendation and sentenced the appellant to death by electrocution. He appealed, and this court affirmed his conviction. Pierce v. State, 576 So.2d 236 (Ala.Cr.App. 1990). However, we remanded the case for resentencing because a victim impact statement containing improper information had been admitted during the sentencing phase of his trial. Id. On return to remand, this court remanded the case for a hearing to determine whether the prosecution could provide race-neutral reasons for its use of peremptory challenges to remove blacks from the jury venire. Pierce v. State, 586 So.2d 1005 (Ala.Cr.App.1991). On second return to remand, this court found that the prosecution had offered race-neutral reasons for its strikes and that the trial court had properly resentenced the appellant to death. Pierce v. State, 612 So.2d 514 (Ala.Cr.App.1992). The Alabama Supreme Court affirmed the conviction and sentence, Ex parte Pierce, 612 So.2d 516 (Ala.1992), and the United States Supreme Court denied the appellant's petition for certiorari review. Pierce v. Alabama, 510 U.S. 872, 114 S.Ct. 201, *563 126 L.Ed.2d 158 (1993). This court issued a certificate of judgment on February 3, 1993. The relevant facts of the case are set forth in the above-referenced opinions.
On December 2, 1994, the appellant filed a petition for post-conviction relief pursuant to Rule 32, Ala. R.Crim. P. The State responded, arguing that the appellant's claims were either precluded or lacked merit. On February 13, 1996, the circuit court summarily dismissed several substantive claims the appellant had raised in his petition, finding that they were precluded because the appellant could have raised, or did raise, the claims at trial or on direct appeal. Rule 32.2(a)(2), (3), (4), and (5), Ala. R.Crim. P. The circuit court ordered that an evidentiary hearing be held on the appellant's remaining claims, which included ineffective-assistance-of-counsel, Brady, and juror-misconduct claims. On August 8, 1996, the appellant amended his Rule 32 petition, and the State again responded that the claims were precluded or lacked merit. Following an evidentiary hearing, the circuit court, by order entered March 25, 1997, denied relief on the appellant's remaining claims. This appeal follows.
The appellant raises substantive claims alleging errors during his trial and claims that his counsel rendered ineffective assistance during his trial. In reviewing the circuit court's denial of the appellant's petition, we are mindful of the following principles:
"`"[T]he plain error rule does not apply to Rule 32 proceedings, even if the case involves the death sentence." Thompson v. State, 615 So.2d 129 (Ala.Cr.App. 1992).' Cade v. State, 629 So.2d 38, 41 (Ala.Crim.App.1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 221 (1994).
"In addition, `[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.' State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App. 1993)."
Brownlee v. State, 666 So.2d 91, 93 (Ala. Cr.App.1995).
"To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) that his counsel's performance was deficient and (2) that he was prejudiced as a result of the deficient performance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
"`The appellant must show that his counsel's performance was unreasonable, considering all of the attendant circumstances.... "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.'

"Duren v. State, 590 So.2d 360, 362 (Ala. Cr.App.1990), aff'd, 590 So.2d 369 (Ala. 1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).
"When this court is reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Luke v. State, 484 So.2d 531, 534 (Ala.Cr.App.1985). The burden is on the appellant to show that his counsel's conduct was deficient. Luke.

"`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude *564 that a particular act, or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'

"Strickland, 466 U.S. at 689, 104 S.Ct. at 2065-66. (Citations omitted.) Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
"Initially we must determine whether counsel's performance was deficient. We must evaluate whether the action or inaction of counsel of which the petitioner complains was a strategic choice. `Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable....' Lawley, 512 So.2d at 1372. This court must avoid using `hindsight' to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance. Falkner v. State, 586 So.2d 39 (Ala.Cr.App.1991)."
Hallford v. State, 629 So.2d 6, 8-9 (Ala.Cr. App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994).
"In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the prongs. Id. at 697, 104 S.Ct. at 2069. In fact, the Court explained that `[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' Id. We defer to this guidance and address the `prejudice' prong, for `[w]ith respect to the prejudice component, the lack of merit of [Thomas's] claim is even more stark.' Id. at 699, 104 S.Ct. at 2070."
Thomas v. State, 511 So.2d 248, 255 (Ala. Cr.App.1987) (footnote omitted).
"Furthermore, to render effective assistance, an attorney is not required to raise every conceivable constitutional claim available at trial and on appeal. Holladay v. State, 629 So.2d 673 (Ala.Cr. App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994); McCoy v. Lynaugh, 874 F.2d 954, 965-66 (5th Cir.1989). Rather, counsel must be given some discretion in determining which claims possibly have merit, and, thus a better chance of success, and which claims do not have merit, and, thus have little chance of success. Heath v. State, 536 So.2d 142 (Ala.Cr. App.1988); Smith v. Murray, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); Engle v. Isaac, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)."
Davis v. State, 720 So.2d 1006, 1014 (Ala. Cr.App.1998).
Finally, the judge who presided over the appellant's trial also presided over the Rule 32 proceedings. "In some cases, recollection of the events at issue by the judge who presided at the original conviction *565 may enable him summarily to dismiss a motion for postconviction relief." Little v. State, 426 So.2d 527, 529 (Ala.Cr.App. 1983). See also Holland v. State, 621 So.2d 373, 375 (Ala.Cr.App.1993), opinion extended after remand, 654 So.2d 77 (Ala. Cr.App.1994); Ex parte Hill, 591 So.2d 462, 463 (Ala.1991); Sheats v. State, 556 So.2d 1094, 1095 (Ala.Cr.App.1989).

I.
The appellant's first contention is that extraneous influences on the jury during his trial deprived him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under Alabama law. Specifically, he claims that Sheriff Douglas Whittle was a key State witness who had improper close and continual contact with the jury throughout the trial, thus violating Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). For several reasons, we disagree.
At the outset, we hold that the appellant has not satisfied his burden of proving that the alleged improper contacts between Whittle and the jury constitute newly discovered evidence. Therefore, the circuit court correctly found that the appellant's claim concerning Whittle's alleged improper contact with jurors was procedurally barred because the appellant could have raised it at trial or on appeal but did not. Rule 32.2(a)(3) and (5), Ala. R.Crim. P.
With regard to newly discovered evidence, Rule 32.1(e), Ala. R.Crim. P., provides:
"Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:
"(1) The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;
"(2) The facts are not merely cumulative to other facts that were known;
"(3) The facts do not merely amount to impeachment evidence;
"(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and
"(5) The facts establish that petitioner is innocent of the crime for which the petitioner was convicted or should not have received the sentence that petitioner received."
When filing a petition for post-conviction relief, "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Rule 32.3, Ala. R.Crim. P. The appellant has not satisfied his burden of proving that his allegations qualify as newly discovered evidence.
First, the appellant has not shown that the facts were not known to him or his trial counsel at the time of the trial, sentencing, or filing of a post-trial motion, or that they could not have been discovered through the exercise of due diligence. The appellant's trial attorney testified during the Rule 32 evidentiary hearing. However, he did not testify that he did not know these facts at trial, sentencing, or in time to file a post-trial motion. Nor did he testify that he could not have discovered them through the exercise of reasonable diligence in time to raise an objection at trial, at sentencing, or in a post-trial motion. The appellant did not elicit any testimony from the attorney about what, if *566 anything, the attorney observed regarding Whittle's contact with jurors during the trial. Also, he did not elicit any testimony that the attorney attempted to discuss Whittle's actions with the jurors after the trial and before filing a motion for a new trial. Likewise, he did not elicit any testimony that the attorney attempted, after the trial and before filing a motion for a new trial, to interview Sheriff Whittle or his deputies about the contacts. Because the appellant was certainly aware that Whittle was in charge of the jurors during the trial, as set forth more fully below, he could have raised such questions immediately after the trial.
The appellant's trial attorney testified that his strategy at trial was to attack the police investigation. However, when it became apparent that Whittle would be in charge of the jury during its sequestration, the appellant did not object. When the trial judge ordered that the jury be sequestered, the following occurred:
"[The Court]: According to the law, you will not be able to separate and that means that all of you are going to have to stay together throughout the course of the trial. Arrangements have been made for you to eat together and arrangements have also been made for you to stay together every night until the trial is over with. So, between now and 1:30, you will go with the Bailiff and you can call or make arrangements for somebody to bring up your clothing or your overnight kit and that type of stuff.
"Sheriff, where are they staying?
"[Sheriff Whittle]: They are staying at Enterprise at the Comfort Inn.
"[The Court]: The Sheriff will be able to explain that to you and arrangements will be made for you to get to Enterprise to the Comfort Inn. This will all be paid for by the Administrative Office of Courts in Montgomery as well [as] your meals."
(T.R. 619.) Also, during the trial, the trial judge explained to the jurors that the sheriff's department would make arrangements for transportation to the motel where they were sequestered, stating as follows:
"If you will go back with the Bailiff, the Sheriff will make arrangements for you to get to the motel."
(T.R. 776.) Finally, during the trial, the trial judge explained to the jurors that the sheriff's department would make arrangements for them to eat lunch, stating as follows:
"If the Jury will go back with the Bailiff, the Sheriff's Department will make arrangements for you to eat lunch."
(T.R. 895.) The appellant did not object in either instance.
"Ordinarily, the sheriff and his deputy are the proper officers to have charge of a jury during their deliberations, and that includes the rendering of such services to them as their physical condition needs. 16 Corpus Juris 1073, § 2520. They should not be separated except on the orders of the court, as we have shown. But there is ordinarily no impropriety in furnishing them with such supplies as are necessary to make them comfortable. This would include such as was done in this case, if with the approval of the court. 34 A.L.R. 1182, 79 A.L.R. 832. If the sheriff and his deputy have testified to important facts, that does not always disqualify them from having charge of the jury. 16 R.C.L. 325; 16 Corpus Juris 1074; Owens v. State, 68 Fla. 154, 67 So. 39, Am.Ann. Cas. 1917B, 254.
"If defendant thinks that they are disqualified for this or other cause, he should ask the court to have another substituted for them. It does not here *567 appear that this was done, and no excuse assigned for not doing so."
Harris v. State, 233 Ala. 196, 198, 172 So. 347, 348 (1936).
Thus, the defense knew at trial that Whittle would be responsible for making arrangements for the jurors throughout their sequestration. Therefore, the appellant could have objected on this ground at trial or on appeal.
Clearly, the appellant has not satisfied the requirements of Rule 32.1(e), Ala. R.Crim. P. First, he has not shown the information was not known or could not have been known at the time of trial or sentencing or in time to file a post-trial motion. Rule 32.1(e)(1), Ala. R.Crim. P. Second, the appellant has not shown that, if the information had been known at the time of trial or sentencing, the result probably would have been different. Rule 32.1(e)(4), Ala. R.Crim. P. Finally, he has not shown that the facts establish that he is innocent of the crime or that he should not have received the sentence he received. Rule 32.1(e)(5), Ala. R.Crim. P. Therefore, the appellant's claim does not constitute newly discovered evidence, and the circuit court properly found that the claim is precluded because the appellant could have raised it at trial or on appeal but did not. Rule 32.2(a)(3) and (5), Ala. R.Crim. P.
Even if this claim were properly before us, we would decide it adversely to the appellant. First, the facts do not support the appellant's claim that Whittle had an improper close and continual association with the jurors. Second, the record does not show that Sheriff Whittle was a key State witness. Third, the appellant has not shown any evidence that he was actually prejudiced by any contacts between Whittle and the jury.
First, the appellant has not shown that Sheriff Whittle had close and continual contact with the jurors. At the evidentiary hearing on the appellant's Rule 32 petition, three jurorsGerald Butler, Robert Owens, and Keith Browntestified regarding Sheriff Whittle's contact with the jury during the trial. Dot Kirkland, who served as a matron for the jurors during the trial, also testified regarding Sheriff Whittle's contacts with the jurors during the trial.
Gerald Butler testified that he thought Whittle was in the courtroom with other law enforcement personnel at one time during the trial, but he was not sure. He did not remember Sheriff Whittle driving the jurors or eating with the jurors any time during the trial. He did testify that, on some mornings during the trial, Whittle went to the motel where the jurors were staying to make sure everything ran smoothly.
Butler also testified that, on the morning just before the sentencing hearing began, Whittle told him there would be extra security in the courtroom because a member of the defendant's family had threatened the jury. However, Butler stated that he and Whittle did not discuss the facts of the case during that conversation. He also added that he did not discuss the facts of the case at any time with Whittle or any of the bailiffs or deputies. Finally, he testified that the extra security in the courtroom did not disturb him.
Robert Owens testified that Whittle did not drive the jurors while they were sequestered. Although he stated that Sheriff Whittle was sometimes "with" the jurors at lunch, Owens also testified that only some of the deputies and Dot Kirkland "ate with" the jurors. He testified that he had known Whittle all of his life, but stated that that did not have any effect on his decisions as to the appellant's guilt *568 or during sentencing. He further testified that he followed the trial court's instructions and made his decisions based only on the testimony, exhibits, and evidence presented at trial.
Keith Brown testified that he did not specifically remember who drove the jurors back and forth between Geneva and Enterprise, although he indicated that he thought Whittle and some of his deputies did. He stated that he did not remember being in the car Whittle was driving. He also testified that Whittle and some of his deputies went with the jurors to eat lunch. However, he stated that Whittle did not discuss the facts of the case during lunch. Brown testified that he overheard something in the hallway of the courthouse about the defendant's family making threatening comments. Although he was not sure, he testified that he thought the people he heard talking were deputies. However, he testified that the fact that he heard about the threats did not affect his deliberations.
Dot Kirkland testified that she, Whittle, and the chief deputy drove the vehicles that transported the jurors during the trial and that they accompanied the jurors to lunch. She added that neither she, Whittle, nor the chief deputy talked to the jurors about the facts of the case.
Thus, the evidence concerning Sheriff Whittle's contact with the jury was conflicting. The appellant alleges that Whittle talked with the jurors about the case and that Keith Brown heard Whittle and his deputies discussing the threats the appellant's family made against the jury. All of the testimony at the evidentiary hearing established that Whittle did not discuss the facts of the case with the jurors. The only mention of a conversation between Sheriff Whittle and a juror was that, on the morning before the sentencing hearing, Whittle communicated to Juror Butler the fact that security was being increased because the appellant's family had threatened the jurors. However, this occurred after the appellant had been found guilty, and Butler testified that it did not affect his sentencing recommendation. Juror Brown testified that he thought he overheard deputies, not Whittle, discussing the threat, but stated that it did not have any effect on his deliberations.
The appellant also cites Dot Kirkland's testimony that Whittle ate lunch with the jurors every day and transported the jurors to and from Enterprise every day during the trial, and states that these assertions are supported by other testimony. However, there was also testimony that Whittle did not drive or eat with the jurors during the trial. Again, the testimony was conflicting. In such an instance, the circuit court's decision regarding the credibility of the witnesses should be given great deference. Here, the circuit court, in addressing the merits of the appellant's claim, made the following findings of facts after the evidentiary hearing:
"The next claim is that jurors had ex parte contact with Sheriff Whittle during the trial. There was testimony presented at the Rule 32 hearing that Sheriff Whittle, on occasion, helped transport the jurors to lunch and to and from their hotel. There was no evidence presented that the Sheriff ate with the jurors or that any discussion occurred between the jurors and the Sheriff concerning the facts of the case. In fact, three jurors testified at the Rule 32 hearing that there was no discussion between Sheriff Whittle and these jurors about the facts of this case. Further, the jurors testified that the fact that Sheriff Whittle helped transport them on occasion did not affect their deliberations in *569 this case. Thus, this claim is without merit."
(C.R.345.)
The circuit court properly found that the appellant did not show that Whittle had improper close and continual contact with the jury throughout the trial. Because there was conflicting testimony about Whittle's contact with the jury, it was the circuit court's responsibility to make credibility choices and to resolve the conflicts in the testimony. The record of the evidentiary hearing supports the circuit court's findings, see Nathan v. State, 689 So.2d 934 (Ala.Cr.App.1996), and we will not overturn them. Based on the circuit court's findings and the evidence presented at the evidentiary hearing, we hold that the appellant did not present evidence sufficient to support a finding that Whittle had a "close and continual association with the jurors." Turner, supra. Rather, "the attentions are such as might have been expected from the officer in charge of the jury, whoever he might be, when authorized or approved by the trial judge." Harris v. State, 233 Ala. 196, 198, 172 So. 347, 348 (1936). In King v. State, 266 Ala. 232, 238, 95 So.2d 816, 821 (1957), this court held:
"The proof shows no undue familiarity between the officers and the juror. In instances of this kind each case stands on its own facts. Bell v. State, 227 Ala. 254, 149 So. 687. The fact that the officer in charge of the jury testifies to important facts, does not always disqualify him from having charge of the jury. Harris v. State, 233 Ala. 196, 172 So. 347."
Because the appellant has not shown that Sheriff Whittle had improper close and continual contact with the jurors during the trial, his argument must fail.
Second, the appellant did not prove that Sheriff Whittle was a key witness in this case. When he was taken into custody in Coffee County, the appellant made a statement about the crime to Coffee County Deputy Jack Hubbard. When Sheriff Whittle and Geneva County Deputy Greg Ward took the appellant into custody from Coffee County officials and transported him to Geneva County, the appellant made another statement regarding the crime. At trial, Hubbard and Ward testified about the substance of the statements the appellant made. The appellant's brother also testified about what the appellant had told him about the crime. In addition, the appellant's friends testified about his suspicious actions after the murder, including his having possession of the victim's automobile, his inconsistent statements about why he was driving the vehicle, and his offer to sell the vehicle to one of his friends for $5. Sheriff Whittle was the last witness to testify for the State, and his testimony was largely repetitive of the evidence already introduced through other witnesses. Although he gave more details in his testimony, the other officers and the appellant's brother had already testified about the substance of each of the appellant's statements. Therefore, much of Whittle's testimony had already been presented to the jury.
In addition, the appellant's testimony at trial was consistent with his previous statements to police. In the statement he made to Whittle, the appellant admitted taking the victim's vehicle but denied killing her. In fact, he stated that a man named Jim told him, at gunpoint, to take the vehicle and leave. He contended that Jim killed the victim. This was consistent with the story he had previously told his brother, Hubbard, and Ward and with his later trial testimony. Furthermore, there was other evidence connecting the appellant to the crime, including the testimony of John Juhnke, Nathan Pierce, and his *570 friends who observed his actions after the crime. Finally, other witnesses testified about the appearance of the crime scene, the discovery of the victim's vehicle, and what the appellant was doing and what clothes he was wearing when he was arrested. Thus, contrary to the appellant's assertions, Whittle was not the State's main witness against the appellant, and his testimony was not necessary to convict the appellant.
The appellant argues that Sheriff Whittle's comments about his demeanor and conduct during questioning were damaging to his defense. On direct examination by the State, Whittle testified that the appellant was quiet, not belligerent, during questioning. During cross-examination, defense counsel elicited Whittle's testimony that the appellant's conduct was not consistent with the way most other suspects acted during questioning. Defense counsel also elicited Whittle's testimony that, during questioning about the murder, the appellant became emotional, started crying, and stated that he did not commit the murder. Finally, counsel elicited Whittle's testimony that the appellant talked to the officers every time they asked him to and that he had been a model prisoner while in jail. Thus, defense counsel attempted to use Whittle's testimony to the appellant's advantage to show that the appellant did not act like other criminals, that he did show emotion about the crime, that he cooperated with law enforcement in the investigation of the crime, and that he was a model prisoner. Accordingly, the appellant's arguments about Whittle's comments are not well taken.
Much of Sheriff Whittle's testimony was merely cumulative to the testimony of the other witnesses. Furthermore, it was consistent with the appellant's trial testimony. Finally, based on the evidence presented by the other State witnesses, Whittle's testimony was not necessary to obtain a conviction. Therefore, the appellant did not prove that Sheriff Whittle was a key witness for the State.
Finally, the appellant has not shown that he was actually prejudiced by Whittle's alleged improper contact with the jury. In Holloway v. State, 477 So.2d 487 (Ala.Cr. App.1985), overruled on other grounds, Ex parte McCree, 554 So.2d 336 (Ala.1988), we held as follows:
"More importantly, however, is the fact that no evidence of prejudicial injury to the appellant is presented. `Reversible error will not be presumed, but the burden is upon the appellant to show injury in this respect.' Bowens v. State, 54 Ala.App. 491, 309 So.2d 844 (1974), cert. denied, 293 Ala. 746, 309 So.2d 850 (1975).
"Section 12-16-10, Code of Alabama 1975, establishes the duty of the sheriff to provide suitable lodging and meals for members of a sequestered jury. Furthermore, the sheriff and deputies are the proper officers to have charge of the jurors during their deliberations, and that includes the rendering of such services to them as their physical conditions require. Pounders v. State, 55 Ala.App. 204, 314 So.2d 123 (1975).
"To follow the appellant's reasoning would require this court to bar all deputies from their jury management duties established by law when the sheriff or any of his deputies were to testify at the same trial. Absent a clear showing that the sheriff or deputies who managed the jury were in fact the same individuals who testified at trial and a showing of some prejudicial injury to the appellant, reversible error will not be found."
477 So.2d at 488. See also Harris v. State, 632 So.2d 503, 518-19 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 *571 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
The appellant argues that Sheriff Whittle's contact with the jurors was per se prejudicial. However, Turner does not set forth an absolute rule requiring reversal every time a State witness comes into contact with the jury. State v. Kelley, 192 W.Va. 124, 451 S.E.2d 425 (1994); Gonzales v. Beto, 405 U.S. 1052, 92 S.Ct. 1503, 31 L.Ed.2d 787 (1972). As Justice Clark stated in his dissent in Turner, a showing of actual prejudice should be required.
"It is with regret that I dissent in this case. If I were sitting on the Supreme Court of Louisiana I would vote to reverse it and do everything possible to put a stop to the practice of permitting an officer who testifies in a case also to be in charge of the jury.
"However, I cannot say that where no prejudice whatever is shownas is the case herethe practice reaches federal due process proportions. I understand that it has the approval of the highest courts of a number of other jurisdictions and is recognized by Wharton, American Jurisprudence and Corpus Juris Secundum. Indeed, in a similar case from the Tenth Circuit, in which this Court denied certiorari in 1951, the court upheld the conviction on the ground that there was no evidence that a testifying sheriff had acted irregularly in performing as custodian of the jury.
"In view of this widespread acceptance of the practice I cannot say that it is violative of the Fourteenth Amendment's Due Process Clause. Cf. my dissent in Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)."
Turner v. Louisiana, 379 U.S. 466, 474-75, 85 S.Ct. 546, 550-51, 13 L.Ed.2d 424 (1965) (footnotes omitted) (Clark, J., dissenting).
We have consistently held that the petitioner in a post-conviction proceeding has the burden of proving he is entitled to relief. In this case, the jurors all testified that Whittle's presence, conversations, and actions did not affect their deliberations. The testimony at the Rule 32 hearing established that Whittle's contacts with the jury were brief, incidental, and without legal significance. Furthermore, the appellant has not shown that Whittle was a key State witness. Thus, he has not proven he was actually prejudiced by any alleged contact between Whittle and the jurors, and he is not entitled to relief on this claim.
The appellant is not entitled to reversal on this ground. He has not shown that his claim constitutes newly discovered evidence; that Whittle had improper close and continual contact with the jury; that Whittle was a key State witness; and that he was actually prejudiced by any alleged contact between Whittle and the jury. For these reasons, we do not find that the appellant was denied his constitutional right to be tried by an impartial jury, and we deny relief on this claim. Any other result would ignore the requirements of Rule 32.1(e), Ala. R.Crim. P.

II.
The appellant's second contention is that, during voir dire examination, jurors withheld vital information about their relationships with law enforcement officials, thus depriving him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under Alabama law. Specifically, he contends that jurors Gerald Butler and Robert Owens did not properly reveal to defense counsel during voir dire examination that they knew Sheriff Whittle. In support of his argument, the appellant cites State v. Freeman, 605 So.2d *572 1258 (Ala.Cr.App.1992). The circuit court incorrectly found this claim to be procedurally barred by the provisions of Rule 32.2(a)(3) and (5), Ala. R.Crim. P. However, the circuit court also addressed the merits of the claim, finding as follows:
"[T]he question that was asked on voir dire was whether they knew Sheriff Whittle in a personal way or had a personal relationship with him. (T.R. 571, 728, 783-84, 845) This was not the testimony of the jurors at the Rule 32 hearing. Thus, this claim is without merit."
(C.R.346.) We agree with the circuit court's finding that the record does not support the appellant's contention. Therefore, he is not entitled to relief on this claim.
During voir dire examination, defense counsel acknowledged that most, if not all, of the potential jurors would probably know Sheriff Whittle. Therefore, he asked them to reveal any personal relationships with Whittle. At the Rule 32 evidentiary hearing, defense counsel testified that his strategy had been to exclude veniremembers who had personal, social, or business relationships with Whittle, not those who had only general knowledge of Whittle. The record of the appellant's trial reflects that the following occurred when defense counsel questioned the panel of jurors of which Gerald Butler was a member:
"[Defense counsel]: I'm going to go through the State's witnesses and if you know these people in passing, because a lot of them are going to be law enforcement officers here in Geneva County, so I know you're going to know them in passing, but if you know them in some personal way or some personal relationship, if you're good friends or something with him, would you please raise your hand and let me know that. I'm sure most everybody here will know the first one and
"The Court: If any of you are related to any of these witnesses, let me know that also.
"[Defense counsel]: Yes, let me know that also. I know you're going to know the first one because he's the Sheriff of Geneva County, Douglas Whittle. I want you to raise your hand if there is some type of relationship other than just know Doug when you pass him on the street. Does anybody have any type of relationship like that with the Sheriff?"
(T.R. 274.) There is no indication that Butler knew Whittle any more than in passing. At the Rule 32 hearing, Butler testified that Sheriff Whittle was "just an acquaintance," not a personal friend. (R. 16.) Therefore, he correctly remained silent in light of defense counsel's question during voir dire examination.
The trial record reflects that the following occurred when defense counsel questioned the panel of jurors of which Robert Owens was a member:
"[Defense counsel]: Okay. These next ones will be State's witnesses and some of these are law enforcement officers in the county and I know that a lot of you are going to know them even though you may be just a passing acquaintance. If you would, just indicate if you know any of these people as personal friends.
"Do any of you know Sheriff Doug Whittle?"
(T.R. 486-87.) Even though Owens testified that he had known Sheriff Whittle all of his life, he did not testify that they were anything other than acquaintances. There was certainly no indication from his testimony that he and Whittle were personal friends. Furthermore, the appellant has not presented any evidence that Owens had anything more than a passing acquaintance with Whittle. Therefore, there is no *573 evidence that Owens did not properly respond to the question asked during voir dire.
Based on the records from the trial and the Rule 32 evidentiary hearing, this case is distinguishable from Freeman. Because there is no evidence that the jurors did not truthfully answer the questions asked during voir dire, there is no indication that the appellant was deprived of his right to strike a jury from impartial prospective jurors. In fact, both jurors testified that knowing Whittle did not affect their deliberations. Thus, there is no basis for a finding that the jurors' actions "`"might have unlawfully influenced"' the verdict." Freeman, 605 So.2d at 1260 (quoting Ex parte Lasley, 505 So.2d 1263, 1264 (Ala. 1987)). Furthermore, there is nothing to indicate that defense counsel would have struck the jurors if he had known the information revealed by their testimony at the evidentiary hearing. Because the appellant has not satisfied his burden of pleading and proving this claim, see Rule 32.3 and 32.6(b), Ala. R.Crim. P., and because the record refutes the appellant's claim, we decide it adversely to him.

III.
The appellant's third contention is that the record of the post-conviction proceedings in this case is unreliable. On three separate occasions, the appellant's counsel moved to supplement the record on appeal, and the circuit court ordered that the record be supplemented. Nevertheless, the appellant contends that the record is still incomplete or unreliable. For the reasons set forth below, we disagree.
In Ex parte Harris, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), the Alabama Supreme Court addressed a similar claim regarding an incomplete record on appeal. In rejecting the claim, that court held:
"`"When, [as in this case], a criminal defendant is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to mandate reversal. The wisdom of this rule is apparent. When a defendant is represented on appeal by the same attorney who defended him at trial, the court may properly require counsel to articulate the prejudice that may have resulted from the failure to record a portion of the proceedings. Indeed, counsel's obligation to the court alone would seem to compel him to initiate such disclosure. The attorney, having been present at trial, should be expected to be aware of any errors or improprieties which may have occurred during the portion of the proceedings not recorded.... To be sure, there may be some instances where it can readily be determined from the balance of the record whether an error has been made during the untranscribed portion of the proceedings....

"`"We do not advocate a mechanistic approach to situations involving the absence of a complete transcript of the trial proceedings. We must, however, be able to conclude affirmatively that no substantial rights of the appellant have been adversely affected by the omissions from the transcript."'"
632 So.2d at 545-46 (quoting Ex parte Godbolt, 546 So.2d 991, 997 (Ala.1987) (emphasis omitted; emphasis added)). Because the same attorney represented the appellant during the circuit court proceedings concerning, and on appeal from the denial of, the appellant's Rule 32 petition, she should be aware of what occurred during those proceedings. Thus, the appellant *574 has the burden of showing that the incomplete record caused him prejudice. He has not satisfied that burden.
First, the appellant contends that the record is incomplete and unreliable because certain motions and discussions that occurred at the end of the Rule 32 hearing were not transcribed by the court reporter. In response to one of the appellant's motions to supplement, the circuit court conducted a hearing at which the court, defense counsel, and counsel for the State attempted to reconstruct the missing portions of the transcript. From the record before us, it appears that the parties did an admirable job of reconstructing the discussion. Defense counsel contends that the record on appeal remains unreliable because the record of these communications is not "accurate." However, counsel does not point out specifically how the record is not accurate. Counsel also contends that "[i]mportant appellate issues were included in this discussion, and complete review is not possible without a transcript." Again, however, counsel does not specify which important appellate issues were included in those discussions. Further, in the appellant's brief to this court, counsel does not appear to raise any issues concerning things that should have been included in the omitted portions of the transcript. Therefore, the appellant has not shown that he has been prejudiced by the omission of the full discussion.
The appellant also attempts to "question the reliability of the transcript that was provided, given the numerous errors pointed out by petitioner's counsel and admittedly requiring correction." (Appellant's brief at p. 22.) At the outset, we note that the court reporter addressed each error the appellant alleged existed in the transcript and made every effort to correct each alleged error. The circuit court also made every effort to facilitate defense counsel's requests that the record be supplemented. Furthermore, counsel does not specifically point out any additional errors in the transcript. Rather, she makes a general allegation that there might be additional errors in the transcript. The appellant has not proven that the transcript of the Rule 32 proceedings is so incomplete or unreliable as to preclude full review of his claims.
Based on our review of the record, including the three motions to supplement and the three supplemental records, we hold that there is a sufficient, reliable record upon which we can review the appellant's claims. The appellant has not shown that he has been prejudiced by the allegedly unreliable record. Accordingly, his claim is without merit.

IV.
The appellant's fourth argument is that the circuit court erred in adopting the State's proposed order denying his Rule 32 petition. In support thereof, he contends that the order contains factual errors and is based on erroneous legal analysis. Although he objected to the State's submission of the proposed order, the appellant did not object to the circuit court's order denying his petition. Therefore, this issue is not preserved for our review. Morrison v. State, 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990).
Even if the appellant had preserved this issue for our review, we would decide it adversely to him. The record contains a proposed order drafted by the State, which was filed on October 12, 1996. The record also contains the judgment and order issued by the circuit court on March 25, 1997. The court's judgment states, in pertinent part:

*575 "The Court has read and considered each allegation or ground of the petition, as amended, filed by the petitioner; the Court had read and considered each answer, response or traverse to these allegations filed in the respondent's answer; the Court has considered all of the evidence presented relating to the issues raised, and the Court has considered all of the briefs and arguments presented by the parties.
"The Court has independently assessed the petitioner's claim and has independently assessed and weighed the evidence produced. The Court has reviewed the evidence for itself and has independently evaluated each claim in light of the evidence presented and the applicable law.
"The Court has reviewed the proposed opinion filed by the State. The Court has considered the findings and conclusions as presented in the proposed order, and each allegation and argument and proposed findings presented by the petitioner. The Court has considered all of the evidence presented in making its determination.
"The Court hereby adopts the opinion and order filed by the State, marked exhibit `A' and incorporated hereby as set out in detail as the judgment of the Court. The adoption of this order is based on the Court's own evaluation of the evidence and law in the case."
(C.R.364-65.)
In Holladay v. State, 629 So.2d 673, 687-88 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994), we addressed a claim similar to the one raised by the appellant and held as follows:
"The appellant argues that the trial court improperly adopted the State's proposed findings of fact and conclusions of the law, submitted after the Rule 20 [now Rule 32] hearing, thereby denying him a full and fair hearing.
"`While the practice of adopting the State's proposed findings of fact and conclusions of law is subject to criticism, the general rule is that even when the court adopts proposed findings and conclusions verbatim, the findings are those of the court and may be reversed only if clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Hubbard v. State, 584 So.2d 895 (Ala.Cr.App. 1991); Weeks v. State, 568 So.2d 864 (Ala.Cr.App.1989), cert. denied, 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990); Morrison v. State, 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990).'

"Wright v. State, 593 So.2d 111, 117-18 (Ala.Cr.App.1991), cert. denied, 506 U.S. 844, 113 S.Ct. 132, 121 L.Ed.2d 86 (1992)."
See also Hallford, supra; Morrison, supra.
The circuit court's order indicates that the court independently considered the appellant's allegations, the evidence presented, and the findings as proposed by the State. From our review of the record before us, we are convinced that the circuit court's findings of fact and conclusions of law are supported by the record and are not clearly erroneous. Therefore, the circuit court's adoption of the State's proposed order was proper.[1]

*576 V.
The appellant's fifth contention is that his trial counsel did not properly investigate or effectively present critical mitigating evidence during the penalty phase of his trial. Specifically, he contends that, during his investigation, counsel should have discovered evidence concerning physical family violence, family sexual abuse, and the adverse effects alcohol had had on his life. He also contends that counsel did not provide sufficient evidence to the psychologist who testified on his behalf at trial. He further contends that a properly prepared and informed expert would have discovered that he had organic brain problems and suffered from post-traumatic stress disorder. The appellant also argues that counsel's failure to use mitigation evidence was not a reasonable strategic decision and that counsel was ineffective because he did not investigate, prepare, and present evidence that would have been exculpatory. Based on our review of the penalty-phase testimony, the testimony offered during the Rule 32 evidentiary hearing, and the circuit court's findings of fact, we disagree.
In reviewing this claim, we are guided by the following principles. In Daniels v. State, 650 So.2d 544, 568-70 (Ala.Cr.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995), we stated the following regarding a claim that trial counsel had been ineffective during the penalty phase of a capital murder trial:
"In determining whether Haas was ineffective at original sentencing, ... we recognize that the
"`two-pronged Strickland analysis applies whether the ineffectiveness complained of occurred in the defendant's trial or in a subsequent adversarial sentencing proceeding. However, in a challenge to the imposition of a death sentence, the prejudice prong of the Strickland inquiry focuses on whether "the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."'

"Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir.1992) (citation omitted), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993). We also recognize that
"`[w]hile "[i]t should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness," see Blake v. Kemp, 758 F.2d 523, 533 (11th Cir.1985), it is unclear how detailed an investigation is necessary to provide a defendant with the effective assistance of counsel. Strickland only requires that counsel's actions fall within the wide spectrum of what can be considered reasonable assistance of counsel.'

"White v. Singletary, 972 F.2d 1218, 1224 (11th Cir.1992). The principles regarding an attorney's duty to conduct an investigation into mitigating evidence have been summarized as follows:
"`An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence. Thompson v. Wainwright, 787 F.2d 1447, 1451 (11th Cir.1986). First, it must be determined whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be *577 made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end. Funchess v. Wainwright, 772 F.2d 683, 689-90 (11th Cir.1985). If, however, the failure to present the mitigating evidence was an oversight, and not a tactical decision, then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Thus, it must be determined that defendant suffered actual prejudice due to the ineffectiveness of his trial counsel before relief will be granted.'
"Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir.1988).
"Applying the foregoing principles to the issue of whether Haas provided effective assistance of counsel at original sentencing, we conclude that the appellant's claim is without merit. Although the defense called only one witness at the sentencing hearing, that witness was Mrs. Hebert, the appellant's mother, who pleaded for the appellant's life. Mrs. Hebert had retained Haas, conferred with him at length, paid all his trial fees, and, by the time of sentencing, had exhausted her funds. The circuit court's sentencing order stated that `it is apparent to the court that [Mrs. Hebert] was devoted to [the appellant].'
"Since Haas had spoken with Mrs. Hebert about the appellant and had observed by her words and actions that she appeared to be `devoted' to the appellant, we cannot fault Haas for failing to discover the appellant's `traumatic' childhood, in which, according to later testimony by Dr. Herlihy, Mrs. Hebert's `emotional rejection' of her son played a large part. Compare Bertolotti v. Dugger, 883 F.2d 1503, 1520 (11th Cir.1989) (defense counsel held to have provided effective assistance on claim that counsel overlooked or failed to investigate evidence of defendant's traumatic childhood, where counsel interviewed defendant's parents), cert. denied, 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990). See also Beets v. Collins, 986 F.2d 1478, 1488-89 (5th Cir.1993) (although counsel did not `conduct a thorough investigation of [the defendant's] medical, mental, and psychological history,' which would have revealed that the defendant `was raised in abject poverty, experienced a debilitating hearing loss, was afflicted with learning disabilities, had received head injuries as a child, and suffers from battered woman syndrome,' the court observed that the defendant never gave her attorney `any hint that she had been abused by previous husbands or boyfriends. Neither [the defendant] nor any other member of her family ever conveyed to [the attorney] any information giving him reason to believe that she had a history of being physically abused.'), rehearing granted, 998 F.2d 253 (5th Cir.1993); Cantu v. Collins, 967 F.2d 1006, 1016 (5th Cir.1992) (despite fact that counsel failed to present evidence of defendant's `low IQ, emotional immaturity, troubled youth, trauma as a result of his parents' divorce, and appearance of neglect,' court found that counsel had `thoroughly investigated these claims, consulting with his client as well as [client's] father and brother for possible mitigating evidence,' and the claims were not supported in fact), cert. denied, [509] U.S. [926], 113 S.Ct. 3045, 125 L.Ed.2d 730 (1993); Wilkerson v. Collins, 950 F.2d 1054, 1064-65 (5th Cir.1992) (although attorney failed to discover or develop *578 mitigating evidence that defendant had a `deprived family background,' and psychological and mental `limitations,' the court observed that `trial counsel interviewed [the defendant], his mother, and other relatives. Neither [the defendant] nor his relatives were able to supply the names of potential defense witnesses. Investigation did not reveal reason to suspect that [the defendant's] mental capacity was in any fashion impaired.'), cert. denied, [509] U.S. [921], 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); Thompson v. State, 581 So.2d 1216, 1238 (Ala. Cr.App.1991) (upholding circuit court's finding that counsel, who presented only the testimony of defendant's mother at sentencing, was not ineffective for failing to present evidence of the defendant's violent family background, addiction and substance abuse), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
"We hold that Haas was not ineffective at the original sentencing proceeding."
650 So.2d at 568-70 (emphasis omitted).
Furthermore, counsel is not necessarily ineffective simply because he does not present all possible mitigating evidence. "Although the failure to conduct a reasonable investigation of possible mitigating evidence may constitute ineffective assistance of counsel, `counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation.' Stanley v. Zant, 697 F.2d 955, 965 (11th Cir.1983), cert. denied, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984)." Lundy v. State, 568 So.2d 399, 403 (Ala.Cr.App.1990).
"When a decision to not put on certain mitigating evidence is based on a `strategic choice,' courts have always found no ineffective performance. Moore v. Maggio, 740 F.2d 308 (5th Cir.1984), cert. denied, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985); Lowenfield v. Phelps, 817 F.2d 285 (5th Cir.1987), aff'd, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). No two lawyers would try a case exactly the same way.
"We cannot say that counsel's performance is deficient because he failed to call more witnesses at the sentencing phase. `The decision not to call a particular witness is usually a tactical decision not constituting ineffective assistance of counsel.' Oliver v. State, 435 So.2d 207, 208 (Ala.Cr.App.1983). At the hearing on the Rule 32 petition, the appellant's mother, two of his aunts, an uncle, and several old friends offered character testimony. Most of these witness did not have contact with the appellant near the time of the murder. There has never been a case where additional witnesses could not have been called. The appellant presented relatives and personal friends who, upon interview, were found to testify on his behalf. We refuse to set a standard that a court may be reversed because it did not hear unoffered testimony from still more friends and relatives. We also refuse to say that a member of the bar is guilty of ineffectiveness for not calling every witness and friend who was willing to testify. To hold otherwise would clog an already overburdened system with repetitious testimony. The appellant has failed to satisfy either prong of the Strickland test."
State v. Tarver, 629 So.2d 14, 21 (Ala.Cr. App.1993).
"With regard to McKinnon's representation of Morrison at the punishment-fixing and sentencing phases of his trial, we find that the observations of the court in Clark v. Dugger, 834 F.2d 1561, 1568 (11th Cir.1987), are appropriate:

*579 "`The failure to conduct a reasonable investigation of possible mitigating evidence may render counsel's assistance ineffective. Lightbourne v. Dugger, 829 F.2d 1012, 1025 (11th Cir.1987); Thompson v. Wainwright, 787 F.2d 1447, 1450 (11th Cir.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987). "After a sufficient investigation, however, `counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation.'" Lightbourne, 829 F.2d at 1025 (quoting Mitchell v. Kemp, 762 F.2d 886, 889 (11th Cir.1985), cert. denied, 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987) and Stanley v. Zant, 697 F.2d 955, 965 (11th Cir. 1983), cert. denied, sub nom. [Stanley v. Kemp,] 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984)). In essence, "[c]ounsel has no absolute duty to present mitigating character evidence." Id. (quoting Mitchell, 762 F.2d at 889). [Counsel] conducted a reasonable investigation to determine the availability of appropriate mitigating evidence and simply made a tactical decision to not present some of the available mitigating evidence. In this circuit, [counsel's] decision is "accorded a strong presumption of correctness which is `virtually unchallengeable.'" Id. (quoting Sinclair v. Wainwright, 814 F.2d 1516, 1519 (11th Cir.1987) and Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)). Given the alternatives ... faced, [counsel's] handling of the penalty phase was not unreasonable. See Stanley, 697 F.2d at 958-70. We therefore conclude that there has been no showing of ineffective assistance nor prejudice to defendant in the way trial counsel prepared and tried [this] case.'"
Morrison v. State, 551 So.2d at 445.
"We find that the holding of Fleming v. Kemp, 748 F.2d 1435, 1452 (11th Cir. 1984), cert. denied, 475 U.S. 1058, 106 S.Ct. 1286, 89 L.Ed.2d 593 (1986), is applicable here:
"`In summary, we are not persuaded by petitioner's argument that ... [defense counsel] rendered him ineffective assistance of counsel. Petitioner's examples of professional dereliction dissolve away under close scrutiny, leaving at best a handful of colorable claims. A defense attorney is not ineffective solely because his client is sentenced to death. "Intrusive post-trial inquiry into attorney performance," such as that which has been required in this case, may "dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." Strickland v. Washington, [466] U.S. at [690], 104 S.Ct. at 2066. Counsel's performance, here, ensured a fundamentally "fair trial" which "produced a just result." Id. at [686], 104 S.Ct. at 2064. There is no reason to set aside petitioner's conviction or his penalty on account of the representation he received.'"
Bell v. State, 518 So.2d 840, 847 (Ala.Cr. App.1987), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988).
Finally, we note that the appellant bears a heavy burden of proof when he claims that his counsel was ineffective.
"Further, we cannot say that the appellant suffered any prejudice based on counsel's performance because he failed to demonstrate any evidence of mitigation. *580 Prejudice cannot merely be alleged; it must be affirmatively proved. Duren v. State, 590 So.2d 360 (Ala.Crim. App.1990). Thus, the appellant has not shown that there is a reasonable probability that the outcome of his trial would have been different, but for trial counsel's performance. Baldwin [v. State, 539 So.2d 1103 (1988)], Thompson v. State, 581 So.2d 1216 (Ala.Crim.App. 1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992)."
Brooks v. State, 695 So.2d 176, 182 (Ala.Cr. App.1996), aff'd, 695 So.2d 184 (Ala.1997), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997).
During the sentencing phase of the appellant's trial, the appellant's mother, Louise Harrison, testified that the appellant was "raised up hard," that the family was poor, and that she worked to support the family because the appellant's father was an alcoholic. (T.R. 1262-63.) She testified that she and the appellant's father had problems in their relationship, many of which were attributable to alcohol, and that the children were around during many of their confrontations. (T.R. 1265.) She testified that the appellant's father had been alcoholic most of the appellant's life and that the appellant often went places with his father. (T.R. 1263.) She testified that, from a young age, the appellant's father allowed the appellant to drink and to drive. (T.R. 1263.) Harrison also testified that, as a result of his father's permissiveness, particularly with alcohol, the appellant started getting into trouble when he was about 14 years old. (T.R. 1263.) She testified that, at the time of the offense, the appellant drank alcohol quite frequently. (T.R. 1264.) She also agreed that the appellant seemed to have some sort of personality disorder, particularly when he was drinking. (T.R. 1264.) She testified that she thought the way the appellant was raised, his troubled home life, and alcohol affected the appellant and his behavior. (T.R. 1265.) Finally, she asked the jury to spare the appellant's life. (T.R. 1265-66.)
Irene Adams, the appellant's maternal grandmother, also testified that the appellant's father was an alcoholic who rarely worked. (T.R. 1267.) She testified that she and the appellant's paternal grandmother had to help the appellant's mother keep food in the house and clothes on the children. (T.R. 1267.) She testified that the children, including the appellant, often went out with their father when he was drinking and they often drove for him, even before they were old enough to drive, because he was drunk. (T.R. 1267-68.) She specifically testified about one occasion when the appellant was about 9 or 10 years old that they found him with his father and both of them were very drunk. (T.R. 1268-69.) Finally, she testified that she believed the way the appellant was raised had an effect on him. (T.R. 1269.)
Dr. Robert Nolan, a psychologist, testified for the defense during the penalty phase of the trial. He testified that he had consulted fairly extensively with the Department of Corrections in evaluating inmates who had mental health problems. (T.R. 1271.) He testified that the appellant reported to him that, before he was arrested, he drank substantial quantities of alcohol on a daily basis. (T.R. 1272-73.) He also testified that he conducted personality tests that showed that the appellant had several abnormal personality characteristics. (T.R. 1273.) First, he found that the appellant was paranoid, suspicious, and distrustful and that he tended to perceive other people as having mistreated him. (T.R. 1273.) He also found that the appellant was probably jealous and was likely to have difficulty in relationships as a result of his attitudes and habits. (T.R. *581 1273.) He also testified that the appellant probably had a distorted perception of his relationships with other people. (T.R. 1273.) Second, he found that the appellant may have been somewhat alienated and may have had difficulty developing emotional closeness or intimacy with other people. (T.R. 1273.) Third, he found that the appellant was very likely to have problems caused by alcohol. (T.R. 1273-74.) He confirmed that these personality disorders were likely the product of his childhood experiences. (T.R. 1274.) Finally, Dr. Nolan speculated that the appellant's distorted beliefs about other people, coupled with the possibility that he had alcohol in his system, could have caused him to overreact and to commit the murder. (T.R. 1274.) He testified that the test he used to evaluate the appellant was a standardized instrument that was "probably considered the single best instrument available." (T.R. 1278.)
The presentence investigation also revealed that the appellant was raised in a poor home and that his father was an alcoholic who rarely worked. It also showed that the appellant had little structure in his home while growing up, and that he had been drinking and getting into trouble since he was very young.
Counsel also relied on several additional factors that he contended should be considered mitigating. He used the testimony of jailers and/or deputies to show how the appellant behaved after he was arrested and while he was in jail. They testified that the appellant turned himself in to the police and cooperated with them during their investigation of the case. They also testified that he was a model prisoner and that he had adapted well to prison life. Counsel also argued that the judge and jury should consider as mitigating evidence the fact that the appellant had never committed a violent crime before.
During the Rule 32 evidentiary hearing, the appellant's attorney testified about his preparation and presentation of mitigating evidence at the appellant's trial. Contrary to the appellant's assertion in brief, counsel testified that he hired Dr. Nolan to assist him in the sentencing stage of the trial, in addition to determining the appellant's competency. (R. 44.) He testified that Dr. Nolan took a personal history from the appellant, and that he gave the psychologist any documents or information he requested. (R. 44-46.) He also talked to several of the appellant's family members in preparation for the trial, including the sentencing phase. (R. 45-46, 56-57.) He testified that he met with the appellant numerous times to prepare for the trial, and that he consulted with the appellant about who would testify at trial. (R. 53, 57-58.) He testified that his theory during the penalty phase of the trial was to stress the appellant's difficult upbringing, including the fact that his father was abusive toward his mother. (R. 60.) He testified that the family members did not mention anything at that time about the appellant's father physically abusing the appellant. (R. 66.) He testified that the appellant told him he was not an alcoholic and that they decided not to present him to the jury as one. (R. 59-61.) He explained that he believed that attributing the appellant's actions to drugs and alcohol would be a weak defense because the appellant was being tried in a conservative county. (R. 60-61.) Nevertheless, he allowed some testimony about drinking, primarily in the context of the appellant's difficult upbringing. He kept the testimony consistent with that presented during the guilt phase of the trial, at which the appellant testified that he was not intoxicated at the time of the offense and that he did not commit the offense. (R. 62.) Based on counsel's testimony at the Rule 32 evidentiary hearing, the circuit court found that counsel "was a *582 credible witness and this court credits his account of his preparation and investigation." (C.R.307.)
We have also reviewed the extensive testimony and evidence offered by the appellant at the Rule 32 evidentiary hearing, including the testimony of Dr. Patricia Fleming, the appellant's expert. Based on that review, we agree with the circuit court's finding that much of the testimony offered at the Rule 32 evidentiary hearing was merely cumulative to testimony presented at trial. In this regard, the circuit court found as follows:
"Further, the testimony of these witnesses was cumulative of the testimony presented at the penalty phase of the trial. Trial counsel's performance was not `outside the wide range of professionally competent assistance' simply because they failed to present evidence that would have been cumulative of other evidence presented at trial. See, Waters v. Thomas, 46 F.3d 1506, 1517-1518 (11th Cir.1995). The Constitution does not guarantee a perfect trial but rather guarantees a fair trial and a competent attorney. Engle v. Isaac, 456 U.S. 107, 134, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); Waters v. Thomas, supra. In this case, Pierce was given a fair trial and he was represented by a competent attorney.
"Even if this cumulative testimony about Pierce's family background is viewed as grounds for sympathy, it would not have affected the outcome of his trial and sentencing.... Pierce has failed to show that the testimony of these family members would have changed the outcome of his trial or sentencing. Thus, he has failed to show that trial counsel rendered ineffective assistance of counsel."
(C.R.321-22.) As to the appellant's argument that his brain dysfunction negated his ability to form the intent to commit the crime, and that counsel was ineffective for not offering this allegedly exculpatory evidence, the circuit court found:
"While Dr. Fleming testified that Pierce suffered from organic personality syndrome, there was no testimony or inference that this organic brain syndrome equated with lack of intent to commit murder.... This claim of ineffective assistance completely lacks merit."
(C.R.313.) With regard to the appellant's argument that counsel did not adequately prepare Dr. Nolan for the trial, the circuit court found:
"Pierce's final assertion in this claim is that his attorney did not facilitate contact between Dr. Nolan and family members. Pierce presented no evidence in support of this claim at the Rule 32 hearing. [Defense counsel] testified that he would certainly have facilitated contact between Dr. Nolan and family members had Dr. Nolan asked to talk with these family members. Thus, Pierce did not prove that trial counsel's conduct was deficient. Pierce failed to prove a reasonable probability that but for trial counsel's failure to facilitate this conduct that the outcome of his sentencing would have been different."
(C.R.317.) Finally, with regard to the appellant's claim about counsel's presentation of expert testimony in contrast to Dr. Fleming's Rule 32 testimony, the circuit court found:
"This court listened closely to Dr. Fleming's testimony and observed her demeanor during the Rule 32 hearing. It appears to the court from this observation that Dr. Fleming was an advocate on Pierce's behalf rather than an unbiased expert giving her expert opinion.
"Dr. Fleming testified that, in her opinion, Pierce suffered from organic personality syndrome. In Dr. Fleming's *583 opinion, this meant that Pierce was impulsive, was suspicious and lacked proper judgment. Dr. Fleming also testified that, in her opinion, Pierce suffered from post-traumatic stress disorder due to his chaotic upbringing. These diagnoses were based largely on Pierce's self-reports and the reports of his family members. Dr. Fleming did not talk to anyone outside of Pierce's family to confirm these diagnoses. Further, Dr. Fleming did not obtain medical reports to support the family reports that Pierce had been hospitalized for bike accidents and falls which caused his organic personality syndrome. Dr. Fleming also failed to perform medical tests (CAT scans, MRI's) which could have confirmed her diagnosis of organic personality syndrome.
"In addition, Dr. Fleming did not investigate the facts of this case which would have either confirmed or contradicted her diagnosis. Dr. Fleming did not talk to Pierce about the events that occurred on the day of the crime. Thus, Dr. Fleming assumed that Pierce was drinking or was suffering from the effects of post-traumatic stress disorder on the day of the crime. Dr. Fleming was not aware that Pierce testified at the [guilt] phase of the trial that he was not intoxicated on the day of the crime and knew exactly what he was doing.
"A review of the facts of this case reveal that the organic personality syndrome and post-traumatic stress disorder did not play a part in this crime....
"Even if these diagnoses had been presented at the penalty phase of trial they would not have affected the outcome of the sentencing. Pierce brutally murdered his sixty-eight year old victim by beating her in the head with a traction weight while she was bound and gagged because she caught him robbing her. Based on the facts of this case, there is no reasonable probability that but for trial counsel's strategy at the penalty phase of the trial that Pierce would not have been sentenced to death for this crime."
(C.R.314-17.)
The circuit court's findings are supported by the record. Nathan v. State, 689 So.2d 934 (Ala.Cr.App.1996). Our review of the record indicates that counsel adequately investigated and presented mitigating evidence. He also cooperated fully with the expert he hired to evaluate the appellant's mental state. Of course, counsel made several strategic decisions in presenting mitigating evidence, including the decision to downplay the influence of alcohol on the appellant and the decision to call only certain family members as witnesses during the penalty phase of the trial. Based on their Rule 32 evidentiary hearing testimony, we agree that the testimony of other family members and friends would have been largely cumulative and would have added little to the defense's presentation. Thus, we will not second-guess counsel's strategic decisions. Finally, we agree that there was no basis for the appellant's claim that counsel did not discover and present exculpatory evidence.
The appellant has not shown that there was any additional evidence that would have convinced the trial court to change its decision regarding sentencing. Considering all the evidence introduced during the guilt and penalty phases of the trial, we cannot see how the evidence that the appellant argues should have been elicited at the penalty phase would have had any impact on his sentence. It certainly would not have changed the outcome, and it did not render the sentencing fundamentally unfair or unreliable. Accordingly, we find that the appellant's claim is without merit.

*584 VI.
The appellant's sixth contention is that his trial counsel was ineffective because he did not request jury instructions on intoxication and manslaughter. In addressing this claim, the circuit court found as follows:
"Pierce asserts ... that his attorney was ineffective because he failed to request jury instructions on intoxication and manslaughter. Pierce contends that his attorney had evidence that he had been drinking all day on the day of the crime but his attorney failed to elicit this evidence during trial.
"Mr. Eldridge testified at the Rule 32 hearing that Pierce told him that he did not have a drinking problem and was not drinking on the day of the crime. In fact, Pierce testified at trial that he was not intoxicated on the day of the crime and knew exactly what he was doing. (T.R. 1431-1432) Mr. Eldridge testified that Pierce maintained his innocence to him. Mr. Eldridge also testified at the Rule 32 hearing that an intoxication defense was not consistent with a not guilty defense. Thus, Mr. Eldridge did not present evidence of intoxication or request instructions on intoxication or manslaughter at Pierce's trial.
"Trial counsel's decision to attack the lack of physical evidence against his client and to pursue his client's theory that he was not guilty, based on his interviews with Pierce and his outside investigation, was not outside the boundaries of professional representation. Further, Pierce failed to establish that he was prejudiced by trial counsel's decision not to pursue an intoxication defense and request instructions on intoxication and manslaughter. In light of Pierce's testimony at trial, there is no reasonable probability that, but for trial counsel's failure to pursue an intoxication defense or request jury instructions on intoxication, Pierce would have been found guilty of non-capital murder or have been acquitted."
(C.R.332-33.) Based on the evidence introduced at trial and counsel's testimony at the Rule 32 evidentiary hearing, we agree with the circuit court's findings and hold that there was no rational basis that would have supported such instructions.
The appellant's theory at trial was that he was not guilty of the murder. Rather, he contended that a man named Jim was the murderer. Another part of the trial strategy was to challenge the police investigation and the forensic evidence. Therefore, the defense repeatedly pointed out that the police questioned very few witnesses and that they had only one suspect while investigating the crime. The defense argued that there was little or no physical evidence to connect the appellant to the murder. In fact, he argued that the police suspected him and tried him based on his actions after the murder. Thus, instructions on intoxication and manslaughter would not have been consistent with his not-guilty defense.
Furthermore, there was no basis for such instructions under the evidence presented at trial. There was never any contention by either the State or the defense that the appellant committed the offense while intoxicated. In fact, there was little, if any, evidence that the appellant had consumed alcohol on the day of the offense. Furthermore, there was absolutely no evidence that he was intoxicated at the time of the murder. The appellant himself testified that he was not intoxicated on the day of the offense. Finally, counsel testified that he wanted to downplay evidence of drinking because the case was being tried in a conservative community that might not react well to such a defense. Therefore, because there was no rational *585 basis under the evidence presented at trial for such instructions, defense counsel was not ineffective for not requesting them.

VII.
The appellant's seventh contention is that his trial counsel was ineffective because he did not object to State's witness Douglas Whittle having extensive contact with the jury. Although counsel could have raised this contention at trial and on appeal, there is no merit to the claim, as set forth in Part I of this opinion. Accordingly, there was no basis for such an objection by counsel, and counsel was not ineffective in this regard.

VIII.
The appellant's eighth argument is that trial counsel was ineffective because he did not make a motion in limine to exclude what he describes as inadmissible evidence of an alleged robberynamely, the victim's purse and some of the contents thereof. He argues that the items should not have been admitted because they were not properly authenticated and because the chain of custody for the items was broken. This issue is not properly before this court because the appellant raises it for the first time on appeal. Morrison, supra.
Even if the issue were properly before us, we would decide it adversely to the appellant. The appellant argued before the Alabama Supreme Court on direct appeal that the purse and its contents should not have been admitted into evidence. In addressing the claim, that court held:
"Pierce argues that the victim's pocketbook, which had been given to the victim's daughter rather than taken into evidence at the crime scene, should not have been admitted into evidence at trial. Pierce contends that a weak chain of custody for the pocketbook creates a reasonable doubt as to his guilt. However, chain of custody problems relate to the reliability, rather than the admissibility, of the evidence. Williams v. State, 375 So.2d 1257, 1267 (Ala.Cr. App.), cert. denied, 375 So.2d 1271 (Ala. 1979). Any chain of custody problems would therefore be reflected in the weight given to such evidence by the jury, and the trial court did not err in admitting the pocketbook into evidence. Any evidence in the chain was not sufficient as to necessarily create a reasonable doubt.
"Pierce also argues that the court erred in admitting the entire contents of the victim's pocketbook into evidence including material he says was irrelevant and prejudicial, such as records of the victim's donations to her church and in allowing these contents into the jury room during deliberations. At first blush, allowing the entire contents of the victim's pocketbook into the jury room may seem somewhat prejudicial to the defendant. However, the trial judge ruled that allowing the contents of the purse into evidence was neither irrelevant nor prejudicial. Inherent in the judge's ruling is a finding that the probative value of this evidence outweighed its prejudicial effects on the defendant. See C. Gamble, McElroy's Alabama Evidence, § 21.01(4)-(6) (4th ed.1991). We cannot say that the trial judge abused his discretion, thus committing plain error, in making such a finding."
612 So.2d at 519.
Counsel did object at trial to the admissibility of the some of the contents of the purse on predicate grounds, and the trial court overruled those objections. The trial court's rulings on those objections, coupled with this court's and the Alabama Supreme Court's plain error review of the direct appeal of this case, indicate that the *586 items were properly authenticated and admitted. Thus, counsel was not ineffective in this regard.
On direct appeal, we also found that there was sufficient evidence to establish that the murder occurred during the course of a robbery, making the murder a capital offense, because the murder and the taking of the victim's car were part of a continuous chain of events. Pierce, 576 So.2d at 246-47. Therefore, the appellant's argument that he would have been entitled to a conviction for noncapital murder if the victim's purse and its contents had not been admitted into evidence is without merit.

IX.
The appellant's ninth argument is that trial counsel rendered ineffective assistance because he did not object to the jury's exposure to opinions about the victim's worth at the guilt phase of the trial. In support of his claim, the appellant argues:
"At the guilt phase of the trial, the prosecution attempted to gain a conviction by arguing and presenting evidence of the victim's character and worth. During opening statements, the prosecutor described Ms. Brooks as a fiercely independent `very old lady' who managed her life and had a close, loving relationship with her daughter. (TR. 920) The victim's daughter emphasized this opening statement by testifying that her mother kept her house neat all by herself, and that they visited with each other weekly and talked on the phone frequently."
(Appellant's brief, pp. 58-59.) The appellant further argues that, if counsel had objected at trial, the trial court would have been obligated to exclude that evidence and he would have received the benefit of the objection on appeal. Again, this claim is not properly before this court because the appellant did not first present it to the circuit court. Morrison, supra. Furthermore, the appellant's claim is without merit. The appellant argued on direct appeal that such testimony constituted improper victim worth and victim impact evidence. In rejecting that claim, this court held:
"The appellant also alleges that the prosecutor's reference to the victim during his opening statement violated Booth [v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) ] and [South Carolina v.] Gathers [, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989)]. The comment to which the appellant refers is as follows:
"`She was a sixty-nine year old widow that lived by herself, fiercely independent and managed her own life and her own affairs. Life was good to her. She has a daughter, Nancy Miller, who is here today who lives with her husband in Dothan. Her mother was a very old lady and she was fairly independent. Mrs. Miller looked after her mother on occasion and would visit her once or twice a week.' (R. 920.)
"No objection was made to the prosecutor's argument, and we do not find anything improper with his comments. A prosecutor is allowed to argue to the jury what he expects the evidence to show. Furthermore, this evidence does not even approach the type of prejudicial information to which the jurors were exposed in Booth and Gathers.

"The appellant also contends that Nancy Miller's testimony concerning the fact that `she was an only child, that she visited her mother often, and that her mother did not drink or smoke,' that `she was the one responsible for closing out her mother's estate, and [that] she "took care of her affairs" upon her death' should not have been admitted *587 because it was irrelevant. (Appellant's brief, p. 71) This argument is meritless. These matters were certainly relevant within the context of the facts of this case."
576 So.2d at 251-52. Our holding on direct appeal clearly refutes the appellant's contentions. Therefore, the appellant's argument that trial counsel was ineffective in this regard is without merit.

X.
The appellant's tenth contention is that his trial counsel was ineffective because he did not challenge prior to trial the legality of the appellant's arrest. In support of his argument, the appellant asserts that he was arrested for capital murder on May 3, 1988, without a warrant and without probable cause. However, the trial transcript clearly shows that the appellant was not arrested for the capital murder on May 3, 1988. Rather, on May 3, 1988, he was arrested based on an outstanding probation violation warrant from the State of Florida. When they arrested the appellant, Coffee County officers told him he was under arrest for a probation violation. In addition, they told him that Geneva County law enforcement officials wanted to question him about the theft and murder. He was not actually arrested for the capital murder until May 5, 1988. Therefore, the appellant's argument is refuted by the record, and there was no basis for such an objection by trial counsel. Accordingly, trial counsel was not ineffective in this regard.

XI.
The appellant's eleventh contention is that the trial court's requirement that counsel choose between cocounsel and an investigator deprived him of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. To the extent that this claim is a challenge to the trial court's ruling, it is procedurally barred because the appellant could have raised the substantive argument at trial or on appeal but did not. Rule 32.2(a)(3) and (5), Ala. R.Crim. P.
To the extent that this claim is an ineffective-assistance-of-counsel claim, it is without merit. In addressing this claim, the circuit court found as follows:
"Pierce contends ... that his attorney's ineffectiveness was exacerbated because he was forced to choose between the assistance of co-counsel and funds for an investigator. Pierce asserts that the lack of co-counsel required his attorney to bear the full burden of litigating a complex and highly publicized capital murder trial.
"Mr. Eldridge testified at the Rule 32 hearing that this court gave him the option of choosing between co-counsel and an investigator. Mr. Eldridge chose to hire an investigator to assist him in this case. He made this choice because an investigator was more helpful than co-counsel. An investigator could stay out eight hours a day locating and questioning witnesses where co-counsel could not have done this.
"Pierce failed to prove this claim of ineffective assistance of counsel at the Rule 32 hearing. While Mr. Eldridge chose to obtain an investigator rather than co-counsel, there was no evidence presented at the Rule 32 hearing that this choice denied Pierce effective assistance of counsel. As set forth above, Mr. Eldridge was a criminal defense lawyer of considerable experience and ability when he represented Pierce. He presented the best defense possible at both the guilt and sentencing phases of Pierce's trial. Thus, Pierce failed to prove deficient performance. Further, Pierce failed to prove that he was prejudiced *588 by the lack of co-counsel at his trial. The prosecution case against Pierce was overwhelming. There was nothing co-counsel could have done that would have affected the outcome of Pierce's trial or sentencing. Pierce has failed to establish a reasonable probability that but for the lack of co-counsel that the outcome of his trial and sentencing would have been different."
(C.R.342-44.)
The circuit court's ruling is supported by the record, and we agree with its findings. We also note that counsel had the benefit of other attorneys to assist him with the case. He testified that he consulted with several attorneys at the Capital Resource Center and the Southern Poverty Law Center when he had questions about the case and when the State made a favorable settlement offer that the appellant ultimately rejected. He also testified that he obtained a trial manual for defending a capital murder case from the Capital Resource Center. Finally, counsel testified that he felt like he spent the time he needed to adequately represent the appellant.
Although the appellant has made allegations, he has not satisfied his burden of pleading and supporting those allegations factually. Rule 32.3 and 32.6(b), Ala. R.Crim. P. He has not shown that the trial court's ruling deprived him of the effective assistance of counsel. In fact, the various records related to the trial indicate that counsel rendered admirable assistance to the appellant. Therefore, this claim is without merit.

XII.
The appellant's twelfth contention is that the circuit court erroneously dismissed his claim that he was wrongfully denied intoxication and manslaughter instructions at trial. We disagree. The circuit court correctly found that the claim was procedurally barred because the appellant could have raised it at trial or on appeal but did not. Rule 32.2(a)(3) and (5), Ala. R.Crim. P. Furthermore, as set forth in part VI above, this claim is meritless.

XIII.
The appellant's thirteenth argument is that his claim that he was illegally arrested is meritorious and should not have been dismissed. We disagree. The circuit court correctly found that this claim was procedurally barred because the appellant could have raised the issue at trial and on appeal but did not. Rule 32.2(a)(2) and (5), Ala. R.Crim. P. Moreover, as set forth in Part X of this opinion, this claim is without merit.

XIV.
The appellant's fourteenth argument is that inadequate compensation of trial counsel deprived him of his right to counsel and his equal protection rights. To the extent that this argument is a challenge to the statutory limit on attorney's fees in a capital case, it is procedurally barred because the appellant could have raised it at trial and on appeal but did not. Rule 32.2(a)(3) and (5), Ala. R.Crim. P.
To the extent this claim constitutes an ineffective-assistance-of-counsel claim, it is without merit. With regard to this claim, the circuit court found, in pertinent part, as follows:
"Pierce was given an opportunity to present evidence in support of this claim at the Rule 32 hearing. However, Pierce failed to show this court that counsel's performance was deficient due to insufficient compensation. There was no evidence presented that trial counsel was unable to present a defense for *589 Pierce or to prepare for trial because of the limitation on compensation. In fact, the court approved expenses for an investigator and a psychologist.
"It is clear from what is set forth above that Alabama's compensation scheme for capital defense attorneys did not deny Pierce effective assistance of counsel. Pierce has not shown that the compensation scheme caused counsel's performance to fall `outside the wide range of professionally competent assistance.' Strickland v. Washington, 466 U.S. at 960[, 104 S.Ct. 2052]. Pierce failed to establish at the Rule 32 hearing that but for the insufficient funding that the outcome of his trial or sentencing would have been different. Thus, this allegation of ineffective assistance of counsel is without merit."
(C.R.309-10.) We agree with the circuit court's findings.
Furthermore, this court has held that the caps on fees do not violate a defendant's right to the effective assistance of counsel or to equal protection. Slaton v. State, 680 So.2d 879 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993); Smith v. State, 581 So.2d 497 (Ala.Cr.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Sparks v. Parker, 368 So.2d 528 (Ala.), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979).
Finally, this claim is refuted by counsel's testimony at the Rule 32 evidentiary hearing. At that hearing, counsel testified that he spent adequate time on the case and did not take into account how much he would be paid for his time. He testified that he would have spent the same amount of time on the case whether he was paid for it or not, and that the level of compensation he would receive did not affect the number of hours he worked on the case. Moreover, the circuit judge who presided over the appellant's trial and Rule 32 proceedings found that counsel had not rendered ineffective assistance during the trial. In its order denying the appellant's petition, the circuit court specifically found that the appellant had not shown that his counsel's performance was deficient due to inadequate compensation and had not shown that the outcome of his trial or sentencing would have been different but for the alleged inadequate compensation of counsel. The circuit court's findings are supported by the record of the appellant's direct appeal and by the record of the Rule 32 proceedings. Therefore, because the appellant has not satisfied his burden of proof under Strickland or Rule 32.3 and 32.6(b), Ala. R.Crim. P., he is not entitled to relief on this claim.

XV.
The appellant's last argument is that his claim that death by electrocution constitutes excessive, cruel, and unusual punishment is meritorious and should not have been dismissed. We disagree. The circuit court correctly found this claim to be procedurally barred because the appellant could have raised it at trial and on appeal but did not. Rule 32.2(a)(3) and (5), Ala. R.Crim. P.
Even if this issue were properly before this court, we would decide it adversely to the appellant. We have repeatedly held that the death penalty is not per se cruel and unusual punishment and that electrocution as a means of capital punishment does not constitute cruel and *590 unusual punishment. Williams v. State, 627 So.2d 985 (Ala.Cr.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).
The appellant also argues that, because he has already been on death row for nearly 10 years, it would be cruel and unusual punishment for the State to continue to seek his execution. Because he raises this argument for the first time on appeal, it is not properly before us. Morrison, supra. Nevertheless, it is without merit. The Alabama Supreme Court addressed a similar argument in Ex parte Bush, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), and held as follows:
"Bush makes several `plain error' arguments that neither the trial court nor the Court of Criminal Appeals addressed; only one of those calls for any discussion here. That argument is that Bush's incarceration for 16 years awaiting the execution of his death sentence constitutes cruel and unusual punishment prohibited by the Eighth Amendment of the United States Constitution.
"Bush relies primarily upon Lackey v. Scott, 885 F.Supp. 958 (W.D.Tex.1995), a case in which an inmate claimed that his lengthy incarceration on death row constituted cruel and unusual punishment. There, the federal district court stayed the execution in order to address the issue, but the Fifth Circuit Court of Appeals vacated the stay, holding that this particular claim was barred. See Lackey v. Scott, 52 F.3d 98 (5th Cir. 1995). On Lackey's petition, the Supreme Court issued a per curiam order granting a stay of execution `pending the district court's consideration of petitioner's petition for a writ of habeas corpus.' Lackey v. Scott, 514 U.S. 1093, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995). The district court, based upon Fearance v. Scott, 56 F.3d 633 (5th Cir.), cert. denied, 515 U.S. 1153, 115 S.Ct. 2603, 132 L.Ed.2d 847 (1995) (which held that the legal theory underlying a Lackey claim is not novel and thus does not meet the novelty exception to the abuse-of-the-writ doctrine), dismissed Lackey's claim as an abuse of the writ. See 83 F.3d at 117. On appeal, the Fifth Circuit affirmed, holding that `Lackey's claim ... fails on the merits, because White [v. Johnson, 79 F.3d 432 (5th Cir.1996), cert. denied, 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996) ], holds that inordinate delay in carrying out an execution does not violate the prisoner's Eighth Amendment rights. Id. at 439.' Lackey v. Johnson, 83 F.3d 116, 117 (5th Cir.), cert. denied, 519 U.S. 911, 117 S.Ct. 276, 136 L.Ed.2d 198 (1996).
"Nevertheless, the same issue has also been addressed by the Ninth Circuit Court of Appeals in McKenzie v. Day, 57 F.3d 1461 (9th Cir.), cert. denied, 514 U.S. 1104, 115 S.Ct. 1840, 131 L.Ed.2d 846 (1995), where McKenzie, the petitioner, argued that a 20-year delay in the execution of his death sentence amounted to cruel, unusual, and arbitrary punishment. The Ninth Circuit stated:
"`"A defendant must not be penalized for pursuing his constitutional rights, but he also should not be able to benefit from the ultimately unsuccessful pursuit of those rights. It would indeed be a mockery of *591 justice if the delay incurred during the prosecution of claims that fail on the merits could itself accrue into a substantive claim to the very relief that had been sought and properly denied in the first place. If that were the law, death-row inmates would be able to avoid their sentences simply by delaying proceedings beyond some threshold amount of time, while other death-row inmatesless successful in their attempts to delaywould be forced to face their sentences. Such differential treatment would be far more `arbitrary and unfair' and `cruel and unusual' than the current system of fulfilling sentences when the last in the line of appeals fails on the merits. We thus decline to recognize Richmond's lengthy incarceration on death row during the pendency of his appeals as substantively and independently violative of the Constitution."
"`[Richmond v. Lewis,] 948 F.2d [1473,] at 1491-92 [(9th Cir.1990)].
"`....
"`... The delay has been caused by the fact that McKenzie has availed himself of procedures our law provides to ensure that executions are carried out only in appropriate circumstances. That this differs from the practice at common law, where executions could be carried out on the dawn following the pronouncement of sentence, see [Pratt & Morgan v. Attorney General for Jamaica, 3 S.L.R. 995, 2 A.C. 1, 4 All E.R. 769 (Privy Council 1993),] is a consequence of our evolving standards of decency, which prompt us to provide death row inmates with ample opportunities to contest their convictions and sentences. Indeed, most of these procedural safeguards have been imposed by the Supreme Court in recognition of the fact that the common law practice of imposing swift and certain executions could result in arbitrariness and error in carrying out the death penalty. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). We cannot conclude that delays caused by satisfying the Eighth Amendment themselves violate it.
"`We are also mindful that sustaining McKenzie's claim would dramatically alter the calculus in granting stays of execution in the hundreds of death penalty cases now pending before the state and federal courts. By and large, courts have erred on the side of caution in granting stays of execution sought by death row inmates. While the resulting delay may undermine the state's interest in carrying out its sentence expeditiously, see In re Blodgett, 502 U.S. 236, 112 S.Ct. 674, 116 L.Ed.2d 669 (1992), death row inmates have generally been successful in arguing that stays of execution should be freely granted because the state's interest in carrying out its sentence will not be permanently impaired. This argument would lose much of its force in a regime where the state risks being pushed permanently out of bounds if the execution is too long deferred by the process of adjudication. By and large, the delay in carrying out death sentences has been of benefit to death row inmates, allowing them to extend their lives, obtain commutation or reversal of their sentences or, in rare cases, secure complete exoneration. Sustaining a claim such as McKenzie's would, we fear, wreak havoc with the *592 orderly administration of the death penalty in this country by placing a substantial premium on speed rather than accuracy.
"`....
"`... McKenzie nevertheless argues that we have an obligation to enter a stay because the Supreme Court recently entered a stay in Lackey to allow the district court in that case to consider whether inordinate delay in carrying out the sentence of death constitutes cruel and unusual punishment. Lackey v. Scott, 514 U.S. 1093, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995). McKenzie argues that the Supreme Court's stay in Lackey is a signal that the inferior federal courts must enter stays of execution in all cases raising colorable Lackey claims.
"`... Finally, we read the Supreme Court's laconic stay in Lackey as an indication that the justices wish to see the matter explored in cases where it is properly raised, not as a ruling that stays must be entered in all cases raising Lackey claims in disregard of all other equitable considerations....
"`... When considered in light of what we see as a low probability of ultimate success on the merits of McKenzie's Lackey claim, we find no basis for exercising our equitable discretion in issuing a stay.'
"57 F.3d at 1466-69. In its note 16, the McKenzie court stated:
"`Indeed, at least two other prisoners have been executed recently even though they raised potentially meritorious Lackey claims on the eve of their executions. See Free v. Peters, 50 F.3d 1362 (7th Cir.), cert. denied, 514 U.S. 1034, 115 S.Ct. 1397, 131 L.Ed.2d 247 (1995); Williams v. Chrans, 50 F.3d 1363 (7th Cir.1995).'
"57 F.3d at 1468.
"Based on the foregoing, we find no merit in Bush's argument that the same constitutional protections that have kept him from being executed for the past 16 years are simultaneously violating his constitutional rights."
695 So.2d at 139-40. We agree with the reasoning set out in Ex parte Bush and the cases cited therein, and we reject the appellant's argument.
Finally, the appellant argues that Alabama's method of electrocution is unreliable and that it therefore constitutes cruel and unusual punishment. Specifically, he asserts that Alabama's electric chair has malfunctioned twice since he was sentenced to death, and he specifically refers to several executions that he contends were "botched." We addressed a similar argument in McNair v. State, 706 So.2d 828 (Ala.Cr.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998), in which we held as follows:
"`The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there is something inhuman and barbarous,something more than the mere extinguishment of life." Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned "that this act was passed in the effort to devise a more humane method of reaching the result". Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th Cir.1978). Appellant's contention is therefore without merit; death by *593 electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death.'
"Jackson v. State, 516 So.2d 726, 737 (Ala.Cr.App.1985), remanded on other grounds, 516 So.2d 768 (Ala.1986).
"The appellant also contends that trial counsel should have argued that Alabama `utilizes inadequate equipment, unqualified personnel, and inadequate procedures' and that Alabama's electric chair has consistently resulted `in excessive burning and mutilation of condemned prisoners and rendered death by electrocution in Alabama unpredictable and consistently torturous,' as, he asserts, is evidenced by the executions of Horace Dunkins and John Evans (in those executions repeated applications of electrical current were required because of a malfunction in the apparatus) and by the executions of Dunkins, Michael Lindsay, and Wayne Ritter (post-execution examinations revealed burns to portions of the prisoners' bodies).
"`In Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), the United States Supreme Court, in addressing the issue of whether it was cruel for a state to electrocute a prisoner after the state's first attempted electrocution failed, stated:
"`"The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution.... We cannot agree that the hardship imposed upon the petitioner rises to that level of hardship denounced as denial of due process because of cruelty."
"`Id. at 464, 67 S.Ct. at 376-77.
"`The very issues raised by appellant here were addressed in Ritter v. Smith, 568 F.Supp. 1499 (S.D.Ala. 1983), aff'd in part, rev'd in unrelated part, 726 F.2d 1505 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 218[, 83 L.Ed.2d 148] (1984), wherein the court adopted the opinion and views expressed by Judge Sam C. Pointer after a hearing on the issues, in Raines v. Smith, No. 83-P-1080-S (N.D.Ala.) (unpublished order entered June 3, 1983) (certified copy attached as Appendix, Ritter v. Smith, 568 F.Supp. at 1525-27). The claims presented to Judge Pointer were as follows: (1) given the nature of the equipment and the procedures used, there was unnecessary and wanton infliction of pain and suffering upon persons subject to electrocution in Alabama; (2) the equipment and method involve an unreliable method of execution; and (3) electrocution involves, in its method and equipment, a mutilation of the body which should be viewed as contrary to and violative of the Eighth Amendment. Id. at 1525-26.
"`After an evidentiary hearing, Judge Pointer held that the claims were due to be dismissed. Id. at 1527. In reaching this decision, Judge Pointer noted that the testimony established that over the past 50 years the chair in question had been used approximately 154 times without any failure; that Evans suffered no pain after the initial shock; and that *594 the possibility that the chair may malfunction at some time in the future does not render its use unconstitutional. Id. at 1526. Judge Pointer relied upon Francis v. Resweber and In re Kemmler [, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890),] in holding that Alabama's method of electrocution is constitutional. Id. at 1526-27. We agree.
"`There is no evidence before this court that contradicts the findings made by Judge Pointer. There has been absolutely no showing that the State's method of enforcing a death sentence inflicts any more pain than is absolutely necessary. It has not been established that the equipment used in the electrocution of John Lewis Evans malfunctioned or that Evans felt anything after the first split second of the first jolt of electricity administered.'

"Jackson, 516 So.2d at 738."
706 So.2d at 846-47. We adhere to that reasoning in this case and hold that the appellant is not entitled to relief on this claim.
For the foregoing reasons, all of the appellant's claims are either precluded or lack merit. Although the circuit court stated incorrect reasons for its denial of the petition with respect to some of the claims, we are not required to reverse its judgment in this case. If the circuit court's ruling denying a post-conviction petition is correct for any reason, we will not reverse simply because the circuit court stated an incorrect reason for the denial. Sumlin v. State, 710 So.2d 941 (Ala.Cr. App.1998); Long v. State, 675 So.2d 532 (Ala.Cr.App.1996); Swicegood v. State, 646 So.2d 159 (Ala.Cr.App.1994); Roberts v. State, 516 So.2d 936 (Ala.Cr.App.1987); Jenkins v. State, 516 So.2d 935 (Ala.Cr. App.1987). Because all of the appellant's claims are either precluded or lack merit, the circuit court properly denied his petition. Accordingly, we affirm the circuit court's judgment.
AFFIRMED.
LONG, P.J., and McMILLAN, J., concur.
COBB, J., concurs in part and concurs in result in part.
FRY, J., recuses himself.
COBB, J., concurring in part; concurring in result in part.
After much consideration, I agree with the majority's decision to affirm the trial court's denial of the appellant's Rule 32 petition. However, I am concerned about the rationale applied by the majority in arriving at its decision in Part I and VII. Therefore, I offer this special writing. I concur with the decisions and rationale employed by the majority on the remaining issues.
The most problematic and disturbing question before this court is whether Sheriff Whittle served as a key witness for the state while maintaining a close and continual association with members of the jury. The Rule 32 petition approached this question in two ways: first, under the theory that Whittle's alleged dual role did not come to light until after the trial and that it was, therefore, newly discovered evidence; and second, under the theory that trial counsel was ineffective for failing to object to Whittle's dual role. The majority disposes of the newly discovered evidence theory by finding that comments by the trial court during the organization of the jury should have fully apprised trial counsel of Whittle's dual role. Thus, according to the majority, failure to object to this issue at trial and to raise it on appeal precludes review of the claim under Rule *595 32.2(a)(3) and (5), and it cannot be excused as newly discovered evidence. Neither, according to the majority, can this claim be reached under a theory of ineffective assistance of trial counsel. The majority states that trial counsel was not ineffective for failing to raise a baseless objection. According to the majority, an objection on this claim would have been baseless because Whittle did not maintain a close and continual relationship with the jury. I agree that Pierce failed to meet the procedural burdens necessary to secure review of his claims in a Rule 32 petition, and for that reason, his conviction is due to be affirmed. However, I write specially because I am not, as my brothers and sister who join the majority opinion are, fully convinced that trial counsel was aware of the nature and extent of Whittle's contact with the jury during the trial, nor am I convinced that Whittle was not serving in the dual capacity as key witness for the state while maintaining a close and continual contact with the jury. I believe that the majority went too far in its rationale supporting its affirmance.

I.
I do not believe that Rule 32.1(e)(5) can apply in a jury contamination case because it presents an impossible burden in these situations. Rule 32.1(e)(5) states that a conviction should be vacated on the basis of newly discovered evidence when, "[t]he facts establish that petitioner is innocent of the crime for which petitioner was convicted or should not have received the sentence that petitioner received." However, newly discovered evidence tending to show that improper and prejudicial influence had been injected into the jury's deliberations would never prove a defendant's innocence. Such evidence would prove only that the defendant had been denied a fair trial as contemplated by the United States and Alabama Constitutions.

II.
The majority contends in Part I of its opinion that the trial court's comments about the sheriff's making "arrangements" for the jurors needs "made it apparent that Whittle would be in charge of the sequestration of the jury" and that therefore, defense counsel should have objected at that time to Whittle's having extensive contact with the jury. The majority cites Harris v. State, 233 Ala. 196, 198, 172 So. 347, 348 (1936), in support of its conclusions that defense counsel knew the sheriff and his deputies were the proper officers to be in charge of a sequestered jury and that he should have objected if he felt the sheriff was disqualified from performing these duties by virtue of also serving as a witness in the case. Quoting Harris, the majority states:
"`If the sheriff and his deputy have testified to important facts, that does not always disqualify them from having charge of the jury.
"`If defendant thinks that they are disqualified for this or other cause, he should ask the court to have another substituted for them. It does not here appear that this was done, and no excuse assigned for not doing so.'"
851 So.2d at 566-67.
The facts in Harris are distinguishable from those in the present case. In Harris, the sheriff and his deputy were in charge of the jury and were both material and important witnesses for the State. However, Harris was a misdemeanor casethe jury was not sequestered. A single juror got sick during those deliberations, and the sheriff and his deputy, without the trial court's permission, took the juror to a drugstore and then to a cafe to rest. The issue in Harris was whether the absence of the sick juror had resulted in the jury *596 being separated after the case had been submitted to it for deliberations, and whether the association of the sheriff and his deputy with the sick juror "`furnished opportunity for ingratiating themselves' in his mind, thereby emphasizing their testimony, and was prejudicial to defendant." Harris, 172 So. at 348. The opinion in Harris suggests that the sick juror testified that nothing improper occurred or was discussed while he was with the sheriff and his deputy. There was no evidence presented that the sheriff or his deputy had any contact with the remaining jurors, aside from their duties inside the courtroom. The Harris court ruled that the defendant did not suffer injury because of the jury's separation or because of the sick juror's contact with the sheriff and his deputy. Harris specifically distinguished Oliver v. State, 232 Ala. 5, 10, 166 So. 615, 616 (1936), in which: "the officer in charge of the jury was the one who chiefly worked up the evidence for the state, and was with the jury during deliberations, and slept and ate with them, and it was a serious felony case, and he was neither the sheriff nor his deputy, but the coroner." Harris, 172 So. at 358. Harris concluded that, unlike Oliver, "[n]o such facts are here disclosed. But the [Sheriff's] attentions are such as might have been expected from the officer in charge of the jury ..." Id. Oliver is closer factually to the present case than is Harris.
Moreover, Harris predates the United States Supreme Court opinion in Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), in which that Court held that a close and continual association between the prosecution's key witness and the jury deprived the defendant of the right to a trial by an impartial jury as required by the Due Process Clause of the Fourteenth Amendment of the United States Constitution. As Turner points out, contrary to the majority's opinion, it is not whether a sheriff has responsibility for, or makes arrangement for, the needs of a jury that is objectionable, rather it is the fact that a "key witness" maintains a "close and continual association with the jurors" that is objectionable.
Based on Turner and Gonzales v. Beto, 405 U.S. 1052, 92 S.Ct. 1503, 31 L.Ed.2d 787 (1972) (discussed infra), I agree with the majority's assertion that a sheriff or his deputies are not always disqualified from having charge of the jury by virtue of their testifying in a case. I also agree that when it is apparent that a sheriff is disqualified from caring for the jury, the defense should immediately object. I disagree that the comments cited by the majority opinion should have suggested to defense counsel that the sheriff, in arranging for the jury's sequestration, would himself personally attend the jury. In my opinion, the following statements would not put trial counsel on notice that the sheriff would be in a "close and continual" association with the jury: "[Y]ou will go with the Bailiff"; "Sheriff where are they staying?"; "If you go back with the Bailiff, the Sheriff will make arrangements for you to get to a motel"; and "If you go back with the Bailiff, the Sheriff's Department will make arrangements for you to eat lunch." These statements indicated that the sheriff or his deputies would make arrangements for the jury's transportation, lodging, and eating, but that the jury would be in the company of a bailiff. Arguably, the statement "The Sheriff will be able to explain that to you ....," referring to lodging arrangements, is more problematic. However, I do not believe that even if the sheriff personally explained to the jury its overnight lodging arrangements, that that indicated that the Sheriff would be present and in a close and continual association with the jury.
*597 These comments indicate that the sheriff was fulfilling his duties as contemplated by statute. It clearly is within a sheriff's job to make necessary provisions for a sequestered jury. See, § 12-16-10, Ala.Code 1975. However, this statute does not require a sheriff or a deputy who serves as a witness for the State to personally attend the jurors. A sheriff may delegate those duties when necessary. Therefore, I do not believe that the comments in the present case made it apparent to defense counsel that Whittle would maintain a "close and continual" association with the jury outside the courtroom.

III-A.
As previously stated, in Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), the United States Supreme Court held that a close and continual association between the prosecution's key witness and the jury deprived the defendant of the right to a trial by an impartial jury as required by the Due Process Clause of the Fourteenth Amendment of the United States Constitution. See, State v. Kelley, 192 W.Va. 124, 451 S.E.2d 425 (1994).
The majority states that Whittle was not a key witness. The sheriff's participation in the present case was very similar to that of the deputies in Turner who were deemed to be "key" witnesses. In Turner two prosecution witnesses at trial were deputy sheriffs. The officers conducted an investigation at the murder scene; took Turner into custody; aided by Turner recovered a cartridge clip from the murder weapon; testified about damaging admissions Turner made when he was apprehended and, described the circumstances under which Turner made a written confession. This confession was then introduced in evidence. The Turner court found the deputies to be "key witnesses." The United States Supreme Court stated in Turner: "It is to be emphasized that the testimony of [the deputies] was not confined to some uncontroverted or merely formal aspect of the case for the prosecution." 379 U.S. at 550, 85 S.Ct. 546.
Here, Whittle testified for the State. Whittle was the highest ranking official investigating the crime scene. He stated that as the sheriff, he was in charge of the investigation. He gave the jury his opinions and conclusions concerning the appearance of the crime scene. He obtained physical custody of Pierce from another jurisdiction, transported him to Geneva County, and conducted the interrogation of Pierce concerning Pierce's involvement in the murder. Whittle testified at trial as to what Pierce "said" to him during the interrogation. In addition to his role as investigator for the State, Whittle gave his opinion at to Pierce's demeanor during the interrogation. He also stated that it was his opinion that Pierce was not telling the truth during the interrogation. Whittle's actions are equivalent to those of the deputies in Turner; he was a key prosecution witness. See, Oliver v. State, 232 Ala. 5, 10, 166 So. 615, 616 (1936) (the coroner who was active in investigating the case, in procuring witnesses, and in causing the defendant's arrest, testified to material facts and therefore should not have been permitted to have charge of jury); Miles v. State, 261 Ala. 670, 75 So.2d 479 (1954) (the sheriff conducted entire investigation of case and was the chief actor in discovering and bringing into court evidence against the defendant); Chancellor v. State, 291 Ala. 413, 282 So.2d 242 (1973) (the nature of the sheriff's testimony at trial is not specified in the opinion, but the Alabama Supreme Court cited Turner, Miles, and Oliver as authority for reversing the judgment); State v. Kelley, 192 W.Va. 124, 451 S.E.2d 425 (1994) (the sheriff was a key witness because he was an *598 investigating officer at the crime scene and the error of letting him be in charge of the jury was not harmless).
The majority argues that Whittle was not a key witness because, it says, his testimony was merely cumulative to other testimony in the case and to Pierce's own testimony.[2] The majority states: "Sheriff Whittle was the last witness to testify for the State, and his testimony was largely repetitive of the evidence already introduced through other witnesses.... [T]he appellant's testimony at trial was consistent with his previous statements to police.... [T]here was other evidence connecting the appellant to the crime...."
The fact that his testimony was cumulative did not prevent Whittle from being a key witness. In Radford v. State, 263 Ga. 47, 426 S.E.2d 868 (1993), a deputy who investigated the crime served in the dual role of bailiff and of prosecution witness. He was found to be a key witness, even though some of the deputy's testimony was cumulative of, and was corroborated by, other evidence. In State v. Kelley, 192 W.Va. 124, 129, 451 S.E.2d 425, 430 (1994), the West Virginia Court deemed the sheriff's testimony to be corroborative of and cumulative to other evidence in the case but still found him to be a key witness. That court stated that "as one of the investigating officers in the case, we cannot say that Sheriff Stemple was a `minor' witness for the prosecution." Kelley, 192 W.Va. at 129, 451 S.E.2d at 430. The harm in the present case is the increased weight placed on Whittle's testimony by the jurors and its unwarranted contribution in obtaining a conviction. This harm cannot be eradicated simply because his testimony was cumulative. However, Sheriff Whittle's testimony was more than cumulative to other testimony. On direct examination, Whittle opined that Pierce's demeanor during his interrogation was "unnaturally calm." (Record on direct appeal at R. 1077.) Whittle stated that Pierce looked at him during questioning, except when the crime scene was discussed, at those times, according to Whittle, Pierce looked down at the floor. The effect of this testimony was to imply that there was something wrong with Pierce's story or that his conscience was bothering him. On cross-examination the defense attempted to put a different spin on this testimony by establishing that Pierce's demeanor during questioning was not consistent with guilt, but rather was consistent with that of someone who had cooperated fully with the investigation and who had been a model prisoner.[3] In response to this line of questioning Whittle stated that Pierce had not cooperated with the investigation because, in his opinion, "[Pierce] refused to tell the truth." (Record on direct appeal at R. 1086.) Also on cross-examination, Whittle stated that Pierce was always the only suspect in the case and that the sheriff's department made no attempt to find the person Pierce had referred to as "Jim." Also on cross-examination, Whittle stated that he was sure on May 3 that Pierce was the "right man" to arrest for the murder. (Record on direct appeal at R. 1090.) None of the information summarized above is contained *599 in any other testimony; it is certainly not in Pierce's testimony. Whittle's testimony is clearly not "confined to some uncontroverted or merely formal aspect of the case for the prosecution." Turner, supra. Instead, I think it is very persuasive testimony for the county's head law-enforcement officer to tell the jury that, in his opinion, the defendant is not only a liar but that he also acted guilty during questioning. The weight afforded such damning testimony goes to the very heart of why a witness should not be in a position to ingratiate himself or herself with the jury. I do not believe that the sheriff's testimony was merely cumulative nor do I believe that his presenting cumulative evidence prevents him from being considered a key witness for the prosecution. In addition, the sheriff is an important elected official with greater stature and influence over a jury than a deputy.

III-B.
I disagree with the majority's conclusion that Whittle did not have a close and continual relationship with the jury. The majority bases its conclusion that Whittle was not in close and continual association with the jury on the fact that "[a]ll of the testimony at the evidentiary hearing established that Whittle did not discuss the facts of the case with the jurors." 851 So.2d 568. Turner made it clear that a lack of discussion about the case is not determinative as to whether prejudice exists. It is the opportunity to foster confidence in the witness that increases the weight the jury gives his testimony that is prejudicial.
In Turner, the jury was sequestered during the course of the trial, and was "`placed in [the] charge of the Sheriff' by the trial judge." Turner, 379 U.S. at 547, 85 S.Ct. 546. The trial lasted three days. The two deputies testified for the State and were among the sheriff's deputies who "drove the jurors to a restaurant for each meal, and to their lodgings each night. The deputies ate with them, conversed with them, and did errands for them." Id. I emphasize "among" because it suggests that the deputies serving as key witnesses for the state were not the only deputies in charge of the jury nor were they always with the jury. It was established at a hearing on a motion for a new trial that "both [deputies] had in fact freely mingled and conversed with the jurors in and out of the courthouse during the trial." The Turner Court found that a close and continual association existed between the deputies and the jury, despite the fact that there had been no showing that the deputies discussed the case with any juror. In consideration of that fact the majority in Turner stated:
"And even if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution. We deal here not with a brief encounter, but with a continuous and intimate association throughout a three-day trialan association which gave these witnesses an opportunity, as [one deputy] put it, to renew old friendships and make new acquaintances among the members of the jury.
"It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were not deputy sheriffs. But the role that [the witnesses here] played as deputies made the association even more prejudicial. For the relationship was one which could not but foster the jurors' confidence in those who were their *600 official guardians during the entire period of the trial. And Turner's fate depended upon how much confidence the jury placed in these two witnesses."
379 U.S. at 547, 85 S.Ct. 546. (Emphasis added.)
The majority's failure to conclude that Whittle had a close and continual association with the jurors is also based on its belief that "the evidence concerning Sheriff Whittle's contact with the jury was conflicting," and that conflicts in the evidence are to be resolved by the trial court. Ample undisputed evidence was presented that Whittle had a close and continual association with the jury. A preponderance of the evidence discloses that Whittle had a close and continual association with the jury. Preponderance of the evidence is defined as
"evidence which is ... of greater weight or more convincing than the evidence which is offered in opposition to it.
"....
"Preponderance of evidence may not be determined by the number of witnesses, but by the greater weight of all evidence, which does not necessarily mean the greater number of witnesses, but opportunity for knowledge, information possessed, and manner of testifying determines the weight of testimony."
Black's Law Dictionary 1182 (6th ed.1990); see Germany v. State, 630 So.2d 132 (Ala.Cr.App.1993).
Over seven and one-half years elapsed between Pierce's jury trial and his Rule 32 hearing.[4] Despite this significant lapse of time, all four witnesses called to testify at his Rule 32 hearing concerning the jury's sequestration during his trial had some recollection of Whittle's performing duties for the jury outside the courtroom. Two of the witnesses remembered with absolute clarity that Whittle performed duties, which in my opinion, placed him in close and continual contact with the jury throughout the trial. I believe that the more credible evidence and the inferences derived therefrom supports the conclusion that Whittle maintained a close and continual association with the jury.
In the present case, the trial lasted five days (the guilt phase lasted four days and the penalty phase lasted one day). The jury was sequestered during that time. The jurors spent nights at the Comfort Inn motel in the City of Enterprise, approximately 20 miles from the Geneva County courthouse. Lunch was eaten in a reserved room at the Chicken Box restaurant in Geneva. Breakfast and supper were eaten at Shoney's restaurant in Enterprise. Before quoting the witnesses' testimony I note that although it is not always entirely clear, in most cases a witness's reference to "you" is meant to refer to the jury as a whole and not to the individual juror.
Juror Keith Brown testified that Whittle did not discuss the case with the jurors. He testified as follows regarding how jurors were transported from Geneva to Enterprise:
"Q. [Ms. Wiesner, defense counsel]: Do you remember anybody else who went with you back and forth to Enterprise?
"A. [Mr. Brown]: The sheriff and a couple of deputies.
"Q. Sheriff Doug Whittle?
"A. Right."
*601 (R. 31.) Brown is perfectly clear that Whittle transported jurors to and from Enterprise everyday.
Brown testified as follows when asked how the jurors got from the courthouse to the Chicken Box for lunch.
"Q. [Defense Counsel]: What meal did you eat here in Geneva?
"A. [Mr. Brown]: Lunch.
"Q. How did you get from the courthouse to where you were eating?
"A. Sheriff's cars.
"Q. Who went with you to eat lunch?
"A. The sheriff and a couple of deputies.
"Q. What sheriff are you referring to?
"A. Sheriff Whittle."
(R. 32.) Brown's testimony is perfectly clear that Whittle did transport jurors to and from lunch and that Whittle "went" with the jury to eat everyday.
Juror Robert Owens testified that Whittle never drove him to or from Enterprise. When asked "Was the Sheriff one of the people who drove you back and forth to Enterprise?" he responded "No." (R. 21.) However, from the context of all the questions put to Owens it appears that he may be referring to himself and not to the entire jury when he states that Whittle did not drive him to and from Enterprise. If that is the case, the possibility remains that Whittle drove other jurors. If it is not the case, then Owens is the only witness who had no recollection of Whittle's being in Enterprise with the jury.
Owens testified as follows when asked about lunch arrangements:
"Q. [Defense Counsel]: Do you remember whether there was anyone with the jury other than the jury members when you were having your meals?
"A. [Mr. Owens]: Nobody except the deputies and Mrs. Kirkland.
"Q. Do you remember anyone else being there?
"A. No.
"....
"Q. Do you know whether the sheriff was with you at lunch?
"A. Sometimes he was."
(R. 22.)
Juror Gerold Butler's testimony suggested that he really did not remember what occurred concerning the jury's sequestration.
"Q. [Defense Counsel]: Was your jury sequestered?
"A. [Mr. Butler]: Yes.
"Q. Where did you stay?
"A. At a motel in Enterprise, I don't remember the name of it.
"Q. How were you transported?
"A. By officials of the sheriff's department [in] cars.
"Q. Do you recall who those people were that drove the cars?
"A. I believe Mr. Tice was one of them, but I don't remember the other one.
"Q. Did Mr. Whittle drive a car?
"A. I don't know.
"Q. Did you ever see Mr. Tice or Mr. Whittle other than during the trial and driving back and forth?
"A. No.
"Q. Where did you eat your meals?
"A. We ate lunch over at a little cafe here in Geneva and we ate at Shoney's in Enterprise.
"Q. How were you taken back and forth to lunch?
"A. We were transported to lunch [in] the sheriff's cars.
"Q. Do you recall who would have been with you as far as law enforcement goes, going to lunch?

*602 "A. If I'm not badly mistaken, Mr. Tice was with us pretty well all of the time and he's the only one I can remember.
"Q. Do you remember either of the bailiffs?
"A. No, not offhand.
"Q. Was Mr. Tice the only person driving a car back and forth to lunch?
"A. No, there was enough of us that we went [in] two automobiles.
"Q. Two deputy cars?
"A. Yes.
"Q. Was there a van?
"A. I don't remember one.
"....
"Q. When you went to lunch and to dinner, was anyone with you watching the jury?
"A. Yes.
"Q. Who was that?
"A. Mr. Tice was the only one I can remember right off. There was another gentleman, but I can't remember who he was."
(R. 6-8.)
However, Butler stated in an affidavit given before the Rule 32 hearing that: "Sometimes, Doug Whittle would come up to Enterprise in the mornings to make sure everything ran smoothly." (C.R.19.) Also, Butler stated that the sheriff spoke directly to him before the sentencing phase of the trial. Butler stated in his affidavit, "The morning just before we had the sentencing hearing, Doug Whittle told me that there would be extra security at the courtroom because someone from the defendant's family had threatened the jury." (C.R.19.) Butler stated that he did not have any additional conversations with the deputies.
Dot Kirkland testified that she was an administrative assistant in the sheriff's office of Geneva County. She was appointed as a bailiff and was responsible for the jury in the present case. These dual capacities enabled Kirkland to have the greatest opportunity for knowledge about the arrangements for the jury. She testified as follows.
"Q. [Defense Counsel]: Where did the jury stay?
"A. [Ms. Kirkland]: At the Comfort Inn in Enterprise.
"Q. How was the jury transported?
"A. In my personal van and two patrol cars.
"Q. Who drove the patrol cars?
"A. The chief deputy and the sheriff.
"Q. What is the chief deputy's name?
"A. Kenneth Tice.
"Q. And the sheriff's name?
"A. Doug Whittle.
"Q. Where did the jury eat their meals?
"A. Shoney's restaurant.
"Q. Did the jury eat at Shoney's for lunch as well?
"A. No, we ate at the Chicken Box here in Geneva for lunch.
"Q. Who accompanied the jury for lunch?
"A. The chief deputy, the sheriff, and myself.
"Q. And that would be the Chief Deputy Tice?
"A. Yes.
"Q. And Sheriff Whittle?
"A. Yes.
"Q. And yourself?
"A. Yes."
(R. 34-35.)
Kirkland unequivocally testified that the sheriff did drive jurors to and from Enterprise and that the sheriff "accompanied" the jury to lunch. Kirkland also stated *603 that the case was not discussed during lunch.
The majority states: "The appellant also cites Dot Kirkland's testimony that Whittle ate lunch with the jurors every day and transported the jurors to and from Enterprise every day during the trial." 851 So.2d at 568. Regarding this testimony, the majority concludes: "[T]here was also testimony that Whittle did not drive or eat with the jurors during the trial. Again, the testimony was conflicting. In such an instance, the circuit court's decision regarding the credibility of the witnesses should be given great deference." 851 So.2d at 568. The majority then cites the circuit court's order, which contains the following findings of fact:
"There was testimony presented at the Rule 32 hearing that Sheriff Whittle, on occasion, helped transport the jurors to lunch and to and from their [motel]. There was no evidence presented that the Sheriff ate with the jurors or that any discussion occurred between the jurors and the Sheriff concerning the facts of the case. In fact, three jurors testified at the Rule 32 hearing that there was no discussion between Sheriff Whittle and these jurors about the facts of this case. Further, the jurors testified that the fact that Sheriff Whittle helped transport them on occasion did not affect their deliberations in this case. Thus, this claim is without merit."
(C.R.345.)
Turner made it clear that the fact that no discussion about the case occurred does not erase the prejudice to Pierce. Additionally, only three jurors testified at the Rule 32 hearing. The effect of the sheriff's presence on the remaining nine jurors is unknown. The circuit judge states "[t]here was no evidence presented that the Sheriff ate with the jurors." This statement is surprisingthree out of four witnesses testified that Whittle either "accompanied," "went with," or "was with" the jury during lunch. A fourth witness stated that he could not remember whether Whittle ate with the jurors. It is a fair inference from their statements that Whittle, "accompanied," "went with," or "was with" the jury during lunch that the witnesses meant that Whittle ate with them. However, even if these phrases are given their literal meaning, Whittle has still improperly placed himself in a position to foster the confidence of the witnesses by driving them to and from Enterprise and to lunch everyday.
Additionally, the circuit court mischaracterized the testimony in its findings that, "Sheriff Whittle, on occasion, helped transport the jurors to lunch and to and from their hotel." Dot Kirkland, Whittle's employee and the official bailiff in this case, and Brown both testified unequivocally that Whittle drove back and forth to Enterprise with jurors. The testimony was unqualified and without restrictions, implying that this was a daily occurrence. Owens testified that Whittle was not one of the people who drove him back and forth to Enterprise. It is entirely possible that this witness meant that he never rode in the car with the sheriff, leaving the possibility that other jurors had ridden in the car with Whittle. Butler testified that he really did not remember, but that "[s]ometimes, Doug Whittle would come up to Enterprise in the mornings to make sure everything ran smoothly." We know from this comment that the sheriff was in Enterprise with the jury some mornings. Regarding lunch, Kirkland stated that the sheriff drove jurors to lunch; Brown stated that the jurors went to lunch in the sheriff's car and the sheriff went with them, implying that the sheriff drove them; Butler stated that the jurors went in sheriff's department cars but did not *604 remember who all were in those cars; and Owens was not asked who drove the jurors to lunch but he stated that the sheriff was present at lunch. The testimony indicates that Whittle had daily contact with the jury outside the courtroom. Moreover, the circuit court does not define what constitutes "occasionally" when the entire time period is a mere five days and four nights. It is surely more than once. Just as the deputies in Turner were only "among" the deputies caring for the jury, I believe that a key witness who "occasionally" chauffeurs the jurors "to lunch and to and from their hotel," approximately 20 miles away, has engaged in prohibited close and continual association with the jury.
While the facts in Turner present a more extreme case, in the present case, the preponderance of the evidence suggests that a relationship between Whittle and the jury existed that "could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial." Turner, 379 U.S. at 474, 85 S.Ct. 546.
Other cases with facts not so extreme as those in Turner support the determination that a prejudicial relationship existed between Whittle and the jury. In Miles v. State, 261 Ala. 670, 75 So.2d 479, 480 (1954), the sheriff "was in charge of [the] jury during noon recess, [walked with] the jury downtown to a cafe, and ate [at the same table] with them, and was in charge of said jury out of the presence of the Court." However, "[n]o conversation was engaged in between the officer and jury in regard to the case." 75 So.2d at 484. The Court held in Miles that "justice requires another trial, free from probability of injury, even though unconsciously brought about, by the association of the officers with the jury." Id. In Chancellor v. State, 291 Ala. 413, 282 So.2d 242 (1973), the Alabama Supreme Court held that "justice requires another trial free of any probability of injury by association of the sheriff with the jury" where the "`Sheriff ... acted as the Bailiff to the jury, taking them to lunch, and in general, looking after their needs.'" Chancellor, 291 Ala. at 414-15, 282 So.2d at 243-44.
I am convinced that a preponderance of the evidence indicates that Whittle had a close and continuous association with the jury.

IV.
I also disagree with the majority's statement that to be afforded a remedy Pierce must show that Whittle's conduct resulted in his suffering actual prejudice. The majority states that "Turner does not set forth an absolute rule requiring reversal every time a State witness comes into contact with the jury." I agree. See, Gonzales v. Beto, 405 U.S. 1052, 1055, 92 S.Ct. 1503, 31 L.Ed.2d 787 (1972) (recognizing that Turner "did not set down a rigid per se rule automatically requiring the reversal of any conviction whenever any Government witness comes into any contact with the jury").[5] However, the majority cites *605 Holloway v. State, 477 So.2d 487 (Ala.Cr. App.1985), overruled on other grounds, Ex parte McCree, 554 So.2d 336 (Ala.1988), for the proposition that actual prejudice is necessary to constitute reversible error. In Holloway, this court stated, "Absent a clear showing that the sheriff or deputies who managed the jury were in fact the same individuals who testified at trial and a showing of some prejudicial injury to the appellant, reversible error will not be found." 477 So.2d at 488 (emphasis added). Holloway can be reconciled with Turner, Oliver, and Miles. In Holloway "[t]he record [was] silent as to whether the deputies managing the jury were in fact the same deputies who appeared as witnesses during the trial." 477 So.2d at 488. The facts in Holloway never established a close and continual contact between the jury and a key witness resulting in possible prejudice. Therefore, there was no showing whatsoever in Holloway of prejudice, because the objection was based on conjecture.[6] I do not believe Holloway controls, where it can be shown, as here, that a key witness maintained a close and continual association with the jury.
The Turner holding makes it clear that if a key witness is in close and continual contact with the jury there is inherent prejudice. To reemphasize, Turner stated: "It would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and ... key witnesses for the prosecution." Turner, 379 U.S. at 473, 85 S.Ct. 546. (Emphasis added.)

V.
In Part VII the majority opinion addresses Pierce's ineffective-assistance-of-trial-counsel claim. He argues that trial counsel was ineffective for failing to object to Whittle's having extensive contact with the jury. The majority states that this issue is precluded from our review because it does not involve newly discovered evidence, and that, therefore, it should have been raised at trial and on direct appeal. The majority also states that for the reasons set forth in Part I of its opinion, there was no basis for an objection because Whittle did not maintain a close and continual association with the jury; therefore, the majority concludes, there is no merit to this claim alleging ineffective assistance of trial counsel.
For the reasons stated in Part II of my special writing, I do not believe that trial counsel necessarily had reason to suspect that Whittle was improperly performing the dual roles of key witness for the state while maintaining a close and continual association with the jury. Therefore, counsel could not be ineffective for failing to object.

VI.
In conclusion, this case is troubling for several reasons. There was considerable *606 evidence presented some 10 years ago, at the initial trial, that after paying Pierce for trimming her hedges, the victim was repaid for her kindness with violence and death. Pierce attacked and murdered Annie Ruth Brooks, a defenseless elderly woman, inside her home, for what was less that $100 and her car. It appears that later that evening Pierce spent the money on beer and sunk the automobile in the Pea River. However, there was also considerable evidence at the Rule 32 hearing that demonstrated a clear violation of the mandate of Turner. What was not clearly proven by the outstanding arguments advanced by Rule 32 counsel was whether the prohibited conduct of Sheriff Whittle, i.e., his close and continual contact with the jury, was newly discovered evidence. Whether the trial judge's comments were sufficient to put trial counsel on notice is questionable, but what is not so clear is whether trial counsel was indeed aware of the sheriff's practice of "courting and caring" for the jury. That question or series of questions was never asked; therefore, they were never answered. Consequently, I do not believe relief should be granted under the guise of "newly discovered evidence"it was not established by a preponderance of the evidence that the sheriff's conduct was not known or could not have been discovered "through the exercise of reasonable diligence." Rule 32.1(e)(1), Ala.R.Crim.P.
For the foregoing reasons, I agree with the affirmance of the circuit court's denial of this Rule 32 petition, but I strongly disagree with the analysis used by the majority to reach that result. Therefore I submit this special writing. I concur with the decisions and rationale employed by the majority on the remaining issues.
NOTES
[1] The appellant also argues that the circuit court improperly entered a "Judgment" that is identical to one entered by the same court in a previous case. However, this issue is not properly before us because the appellant raises it for the first time in his reply brief to this court. McCall v. State, 565 So.2d 1163 (Ala. Cr.App.1990); Hazelrig v. Thomas, 291 Ala. 659, 286 So.2d 830 (1973).
[2] Pierce denied in his statements and in his testimony at trial that he committed the murder; he suggested that a man named "Jim" was present at the crime scene and may have committed the murder.
[3] The majority made note of this defense tactic, stating that "defense counsel attempted to use Whittle's testimony to the appellant's advantage to show that the appellant did not act like other criminals...." This, according to the majority, showed that Whittle's comments about Pierce's demeanor were not harmful. I believe that it was the trial attorney's duty to mitigate the damage from this testimony to the extent possible. I do not agree that it lessens Whittle's status as a key witness.
[4] The jury convicted Pierce of capital murder on January 26, 1989, and recommended a sentence of death the following day. The witnesses discussed above testified at Pierce's Rule 32 hearing on September 18, 1996. Juror Butler's affidavit, also mentioned above, was signed on January 25, 1995.
[5] Alabama cases have held that a new trial is not required in situations where a sheriff, who is an important prosecution witness, has contact with a single juror in an emergency situation, unless prejudice is shown. Harris v. State, 233 Ala. 196, 172 So. 347 (1936) (a misdemeanor case); King v. State, 266 Ala. 232, 95 So.2d 816 (1957). The court held in each of these cases that where a juror becomes ill, it was the sheriff's responsibility to provide assistance to the juror. In each case, the juror testified that nothing improper or prejudicial occurred while he or she was away from the jury or due to contact with the sheriff. Based on those facts, Harris and King are clearly distinguishable from Turner, Oliver, and Miles, where an important witness for the State maintained close and continual contact with the entire jury outside the courtroom. In the present case we are presented with a fact situation where any one or more of the jurors might have been influenced by close and continual contact with a witness for the State.
[6] See, also, Harris v. State, 632 So.2d 503, 519 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). In Harris the issue was whether deputies should have been placed in charge of the jury, given the fact that the victim was a police officer. The deputies in charge of the sequestered jury where not witnesses for the State. This court quoted Holloway for the proposition that it was the defendant's burden to show prejudice and he did not. See, also, State v. Jeune, 332 N.C. 424, 433, 420 S.E.2d 406, 411 (1992) ("a bailiff in a criminal trial is [not] necessarily a custodian or officer in charge of the jury so as to require a conclusive presumption of prejudice").